**Robert E. RUBIN and Patricia Cohen, Plaintiffs–Appellants,**

v.

**SCHOTTENSTEIN, ZOX & DUNN, Richard A. Barnhart, Danny L. Todd, and Gregory A. Todd, Defendants–Appellees.**

No. 96–3017.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 10, 1997.

Decided May 7, 1998.

Bernard D. Mazer (argued and briefed), William C. Donahue, Mazer & Company, Dublin, OH, for Plaintiff–Appellants.

Robert W. Trafford (argued and briefed), Porter, Wright, Morris & Arthur, Columbus, OH, Randall W. Knutti, Ulmer & Berne, Columbus, OH, for Schottenstein, Zox & Dunn and Richard A Barnhart.

Gary D. Greenwald, Shayne & Greenwald, Columbus OH, for Danny L. Todd and Gregory A. Todd.

Before: MARTIN, Chief Judge; MERRITT, KENNEDY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which MARTIN, C.J., MERRITT, NELSON, RYAN, NORRIS, SUHRHEINRICH, SILER, DAUGHTREY, MOORE, COLE, and GILMAN, JJ., joined. KENNEDY, J. (pp. 270–274), delivered a separate dissenting opinion, in which BATCHELDER and CLAY, JJ., joined.

## OPINION

BOGGS, Circuit Judge.

The plaintiffs in this securities-fraud case are private investors from the State of New York who invested $153,000 in an Ohio company, Medical Designs, Inc. ("MDI"). The defendants include Richard Barnhart, an attorney who represented MDI in connection with plaintiffs' investment; Schottenstein, Zox & Dunn, Barnhart's law firm; and the Todds, the two officers (and the majority owners) of MDI. A divided panel of this court previously affirmed the dismissal of the plaintiffs' federal— and state-law claims on the grounds that the defendants had no duty to disclose certain facts in connection with plaintiffs' investment in MDI, and that, in any event, plaintiffs could not reasonably rely on the misrepresentations or omissions made by an attorney representing MDI. *See Rubin v. Schottenstein, Zox & Dunn*, 110 F.3d 1247 (6th Cir.1997). A majority of the active judges of the court voted to rehear the case *en banc*, and the panel's judgment was thereby vacated. *See Rubin v. Schottenstein, Zox & Dunn*, 120 F.3d 603 (6th Cir.1997). We now reverse the judgment of the district court and remand this matter for trial.

I

Because the facts of this case are set out fully in the panel opinion, we limit ourselves to a brief statement of those facts relevant to our disposition, noting preliminarily that the summary-judgment posture of the case requires us to construe factual disputes in favor of the non-moving plaintiffs. *See Richards v. General Motors Corp.*, 991 F.2d 1227, 1235 (6th Cir.1993). In the late 1980s and early 1990s, MDI developed and marketed a device to control pain using transcutaneous electrical nerve stimulations ("TENS"). When MDI was formed in 1988, TENS technology was regarded as a major medical innovation, and the strongly favorable initial market reaction to MDI's product reflected this fact. However, after a 1991 article in the *New England Journal of Medicine* called into question the effectiveness of TENS, MDI's financial prospects took a significant turn for the worse.

Before the *New England Journal* article appeared, MDI's principal source of operating capital was a revolving line of credit provided by Star Bank, N.A. When MDI's sales revenues declined, the Todds (MDI's principal officers) sought additional sources

of funding. Eventually, the Todds approached Rubin and Cohen, proposing that they invest $150,000 in MDI debt and $3,300 in MDI stock (representing a 33 percent equity interest in MDI). The Todds initially met with Rubin and with Cohen's husband (acting as Cohen's agent) in Ohio to discuss the proposed investment. At this meeting, the Todds informed Rubin and Cohen that MDI's credit facility with Star Bank was insufficient to provide necessary working capital, and that therefore they were seeking an infusion of about $150,000 in cash. Because Rubin and Cohen eventually dismissed their claims against the Todds, we need not tarry over the fact that the Todds neglected to mention that the proposed investment would constitute a default under MDI's financing agreement with Star Bank. The meeting in Ohio concluded with the Todds advising Rubin and Cohen to discuss the financial condition of MDI with Barnhart, MDI's attorney.

At the Todds' urging, Rubin telephoned Barnhart. Rubin asked Barnhart a number of questions about MDI's financial soundness as well as its relationship with Star Bank. According to Rubin's affidavit, Barnhart assured Rubin that "there was no problem with the Star Bank and MDI and that it was his opinion that after [Rubin's and Cohen's] investment in MDI that the Star Bank would increase the amount of funding that it was providing to MDI." Rubin averred that Barnhart also stated that "the only problem that MDI had with Star Bank was reducing the percentage of receivables that it was reimbursing MDI under the terms of its financing agreement." Finally, Barnhart told Rubin that "there was no need to contact Star Bank as part of [Rubin's and Cohen's] due diligence."

In addition to Rubin's direct contact with the Todds and Barnhart, Rubin had his attorney, Stephen Weiss, investigate MDI and its relationship with Star Bank in connection with the proposed investment. Weiss submitted an affidavit in the district court in which he recounted a telephone interview with Barnhart regarding the proposed investment. According to this affidavit, when Weiss specifically asked Barnhart about

MDI's relationship with Star Bank, Barnhart replied that "MDI was not experiencing any problems with the Star Bank." Probing further in an apparent effort to understand more fully the Star Bank situation, Weiss asked whether Star Bank would permit Rubin and Cohen to take a security interest in MDI assets. Instead of informing Weiss that MDI was already in default under its financing agreement with Star Bank, or that the granting of a security interest would constitute another incident of default, or—most significantly—that the proposed investment itself would constitute a default, Barnhart stated that "MDI was doing fine with the Star Bank, but that since MDI had experienced some recent operating losses ... the Star Bank would be reluctant to permit the Plaintiffs to have a secured interest in MDI." When Weiss asked to contact Star Bank directly, Barnhart told him "not to contact the Star Bank, because everything with the Star Bank was fine, but it just wouldn't be a good idea to contact them."

On March 27, 1992, after these various meetings and telephone conversations, Rubin and Cohen purchased $150,000 of MDI debt and $3,300 of MDI stock. Despite all the assurances that "things were fine" with Star Bank, Star Bank froze MDI's account as soon as the $150,000 from Rubin and Cohen was deposited in the account. As it happened, the $150,000 loan was a material breach of MDI's financing agreement with Star Bank. On May 5, 1992, MDI voluntarily filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of Ohio. As a result of these events, Rubin and Cohen effectively lost their entire investment in MDI.

## II

One fundamental question posed by this case is whether enterprising attorneys may gratuitously tout their clients' securities unconstrained by the general duty imposed by the securities laws not to make materially misleading statements in connection with the sale of such securities. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, prohibits the use "in connection with the purchase or sale of any security ... [of]

any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe...." 15 U.S.C. § 78j. The SEC's Rule 10b-5 further develops the statutory duty not to mislead:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud, .
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security. .

17 C.F.R. § 240.10b-5.

In determining whether Barnhart and his law firm may be liable for Barnhart's misrepresentations or omissions, we must resolve two preliminary issues: (1) whether Barnhart had a duty to disclose MDI's default status with Star Bank, or to disclose the fact that the proposed investment would constitute an additional incident of default; and (2) whether, if so, Rubin and Cohen had any right to rely on Barnhart's representations or omissions despite the fact that he was not their attorney.

### A

 There is nothing special about Barnhart's status as an attorney that negates his Rule 10b-5 duty to disclose, a duty that ordinarily would devolve under Rule 10b-5 upon a third party under these circumstances. Although under Rule 10b-5(b) and its predecessor, "only those individuals who had an affirmative obligation to reveal what was allegedly omitted can be held liable as primary participants in the alleged deception[, a] duty to disclose naturally devolve[s] on those who h[ave] direct contacts with 'the other side.'" *SEC v. Coffey,* 493 F.2d 1304, 1315 (6th Cir.1974). "Direct contacts may take many forms. An accountant or lawyer, for instance, who prepares a dishonest statement is a primary participant in a violation even though someone else may conduct the personal negotiations with a security purchaser." *Id.* at 1315 n. 24. "A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant." *SEC v. Washington County Util. Dist.,* 676 F.2d 218, 223 (6th Cir.1982). Under the long-established precedents of this circuit, the conversations between Barnhart and the plaintiffs clearly were instances of "direct contacts" sufficient to give rise to a duty to disclose.

The defendants urge that "silence, absent a duty to disclose, does not violate" Rule 10b-5, and that *Coffey*'s direct-contacts analysis does not alter this rule. True enough. But here we are not confronted with Barnhart's silence; on the contrary, Barnhart spoke at length about the proposed investment both with Rubin and with Weiss. The question thus is not whether Barnhart's silence can give rise to liability, but whether liability may flow from his decision to speak to Rubin and Weiss concerning material details of the proposed investment, without revealing certain additional known facts necessary to make his statements not misleading. This question is answered by the text of Rule 10b-5(b) itself: it is unlawful for any person to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b-5(b).[1]

---

1. We are not the only circuit currently considering the extent of an attorney's potential liability for omitting material facts in connection with securities transactions. The United States Court of Appeals for the Third Circuit recently agreed to review *en banc* a panel decision holding a law firm liable as a principal violator of Rule 10b-5, where one of the firm's lawyers elected to speak to potential investors but did not disclose certain facts material to the investment. *See Klein v. Boyd,* Nos. 97-1143, 97-1261, slip op., 1998 WL 55245 (3d Cir. Feb. 12, 1998), *vacated pending*

■ In sum, while an attorney representing the seller in a securities transaction may not always be under an independent duty to volunteer information about the financial condition of his client, he assumes a duty to provide complete and nonmisleading information with respect to subjects on which he undertakes to speak. As the Seventh Circuit so aptly put the point, "[u]nder Rule 10b–5 ... the lack of an independent duty does not excuse a material lie." *Ackerman v. Schwartz,* 947 F.2d 841, 848 (7th Cir.1991). When Barnhart consented to speak to Rubin and Weiss concerning the status of MDI's relationship with Star Bank, and about Star Bank's likely reaction to a substantial loan from Rubin and Cohen, he assumed a duty to speak fully and truthfully on those subjects.

**B**

Having concluded that Barnhart (and, by extension, his law firm) were under a duty not to misrepresent or omit material facts in connection with the proposed investment, the only remaining issue for us to resolve is whether a trier of fact could find that Rubin and Cohen relied reasonably on Barnhart's misrepresentations and omissions. We conclude that a trier of fact could reach such a finding.

**1**

■ We begin with the plaintiffs' reliance on Barnhart's omissions—that is, Barnhart's failure to mention that MDI was in default at the time the proposed investment was being negotiated, or that the proposed investment would itself constitute a default. "In the case of omission or nondisclosure of material facts, the element of reliance on the part of the plaintiffs may be presumed." *Molecular Technology Corp. v. Valentine,* 925 F.2d 910, 918 (6th Cir.1991); *see also Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) ("positive proof of reliance is not a prerequisite to recovery [in a failure-to-disclose case]. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the mak-

ing of this decision."). Neither Barnhart nor his law firm disputes that the omitted facts here in question—facts that go to the heart of MDI's financial viability and specifically to the permissibility of the proposed investment under MDI's financing agreement—were material.

Moreover, the defendants have introduced no evidence to rebut the presumption of reasonable reliance that flows from a material omission. All the defendants offer is the unsupported assertion that Rubin and Cohen could have learned the omitted facts by telephoning Star Bank and requesting the details of the bank's relationship with MDI. It is difficult to imagine that Star Bank would divulge such information on request to an unknown, out-of-state caller. Presumably, divulging such information without the prior consent of MDI could expose Star Bank to an action for trade libel, *see Musa v. Gillette Communications of Ohio, Inc.,* 94 Ohio App.3d 529, 641 N.E.2d 233 (1994), or for interference with prospective business advantage. *See Metropolis Night Club, Inc. v. Ertel,* 104 Ohio App.3d 417, 662 N.E.2d 94 (1995). Star Bank's cooperation seems particularly unlikely in light of Barnhart's strenuous efforts to dissuade Rubin and Weiss from contacting the bank, let alone the economic incentive Star Bank had for the proposed investment to be consummated. In any event, it is not for us to speculate as to whether Star Bank would have provided the information that Barnhart neglected to disclose; this is a summary judgment proceeding in which, absent evidence to the contrary, we must indulge evidentiary inferences in the plaintiffs' favor. If in fact Star Bank has a policy of disclosing information about its borrowers to all comers, the defendants are free to prove it at trial. As currently postured, Rubin and Cohen have shown sufficient facts to merit a trial on their omission-based claim.

**2**

■ Rubin and Cohen also seek recovery on a misrepresentation theory. In a nutshell, they aver that Barnhart told them "Star Bank would look with favor" on the

proposed investment and would likely increase MDI's access to credit as a result, when in fact Barnhart knew that Star Bank would consider the proposed investment a default under the financing agreement. Rubin and Cohen also allege that Barnhart told them (through their attorney) that there was "no problem" with MDI's current relationship with Star Bank, when in fact Barnhart knew that MDI was in default.

The principal authority relied upon by the defendants on appeal is our decision in *Molecular Technology,* where we set forth a list of factors helpful in determining whether a purchaser's reliance on a seller's misrepresentations was reasonable. *See* 925 F.2d at 918. We continue to believe that the nonexhaustive list of eight factors contained in *Molecular Technology* is a useful tool in analyzing the reliance element of a misrepresentation-based securities-fraud claim. In the present context, however, the defendants have focused too closely on the language of the *Molecular Technology* case and, in so doing, have missed the holding. In *Molecular Technology,* we held that a buyer of securities showed facts sufficient to establish a Rule 10b–5 violation where the seller's attorney knowingly prepared a securities-offering circular that contained misleading statements, without disclosing to prospective purchasers certain material facts necessary to make the circular not misleading. *See ibid.* In reversing the district court's judgment in favor of the seller, we emphasized that the test for reasonable reliance is the absence of recklessness, and concluded that where a buyer has no special knowledge of the facts misrepresented by the seller (or his agent), no actual access to information that would have revealed the fraud, and no personal knowledge of the seller prior to the transaction at issue, the buyer cannot be deemed reckless in relying on misrepresentations made by the seller's attorney. *See ibid.*

Here, as in *Molecular Technology,* we cannot say that Rubin and Cohen were reckless in believing and relying on Barnhart's misrepresentations—certainly not at the summary judgment stage, where at best there is a dispute as to whether Rubin and Cohen could have uncovered information (perhaps from Star Bank) that would have revealed Barnhart's misrepresentations. It is true that in large, sophisticated transactions, securities purchasers frequently conduct due diligence efforts substantially more thorough than those conducted by Rubin and Cohen. We must remember, however, that the transaction at issue in this case was denominated in thousands of dollars, not millions. There is no rule that requires a single, constant level of due diligence in every business transaction regardless of size, and we are unwilling to impose one here. While Rubin's and Cohen's behavior might be thought reckless in the context of a multimillion-dollar securities purchase, we believe that the question of recklessness requires a case-by-case, fact-specific inquiry. Here, Rubin asked probing questions both of the principals and of MDI's attorney, and he and Cohen engaged an attorney to conduct further inquiries. MDI's attorney responded to their questions, though Rubin and Cohen did not independently verify the truth of his responses. We cannot say that they were reckless as a matter of law to rely on the word of an attorney, and we therefore decline to dismiss their claims at the summary judgment stage.

We thus are left with the defendants' least persuasive argument: that attorneys should be treated differently from other defendants in securities-fraud cases. According to the defendants, "lawyers, unlike ... other parties to securities transactions, have an obligation of confidentiality that is at the heart of the duties they owe their clients." It is perhaps symptomatic of the current debate over the state of legal ethics that the defendants would invoke the attorney's duty of confidentiality to justify what, if Rubin's and Weiss's affidavits are correct, amount to outright lies. *Cf.* ANTHONY KRONMAN, THE LOST LAWYER: FAILING IDEALS OF THE LEGAL PROFESSION (1993) (generally discussing the question of moral character in the contemporary legal profession). In any event, the mere fact that one party generally may not be entitled to rely on the advice of counsel for another party is an insufficient reason to ignore the statutory rule prohibiting "any person"—not excepting lawyers—from making material misrepresentations in connection

with the sale of securities. The defendants' argument is no more persuasive when phrased as the principle that a party who is represented by counsel cannot rely on the opinion of the other party's attorney.

■ That principle, as a reading of the cases cited by the district court reveals, is limited to reliance on the opinions or research of the other party's attorney on points of law. *See Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir.1989) (alleged misrepresentation "concerned a statute that both parties were aware of, and even more important, the interpretation of that statute"); *Morin v. Trupin,* 711 F.Supp. 97, 104 (S.D.N.Y.1989) ("The misrepresentation allegedly made ... consisted of the legal position of the [defendant law firm's] clients. A party represented by counsel cannot establish justifiable reliance when the claim is premised upon the legal opinion of an adversary's counsel."); *Verschell v. Pike,* 85 A.D.2d 690, 445 N.Y.S.2d 489, 491 (App.Div.1981) ("plaintiff's attorney was not justified in relying upon his adversary's statement that the lease was legal under the zoning ordinance"). The theory is that one's own lawyer ought to be able to detect and cure misleading statements of law from the other side. Extending the principle to factual representations would put an investor in far greater peril in speaking to an issuer's counsel than in speaking with the president of the company. In short, it would allow an attorney to mislead investors with impunity. We cannot endorse this perverse result. Admission to the bar, if anything, imposes a heightened, not a lessened, requirement of probity. Accordingly, we conclude that Rubin and Cohen have shown sufficient facts to entitle them to a trial on their misrepresentation-based claims.

### III

■ The panel opinion in this case affirmed the dismissal of the plaintiffs' state-law claims on the ground that their reliance on Barnhart's representations were not rea-

sonable as a matter of law. *See Rubin,* 110 F.3d at 1257. The elements of a claim for actual fraud under Ohio law are similar to a Rule 10b–5 claim: an actual or implied material misrepresentation or concealment of a matter of fact, knowledge of the falsity, intent to mislead, reasonable reliance, and resulting injury. *See DiPietro v. DiPietro,* 10 Ohio App.3d 44, 460 N.E.2d 657 (1983). A constructive fraud action does not require proof of intent. *See Perlberg v. Perlberg,* 18 Ohio St.2d 55, 247 N.E.2d 306 (1969). For the reasons set forth above, we believe that Rubin and Cohen have shown sufficient facts to support a claim of fraud under Ohio state law. They therefore are entitled to a trial on those claims.

### IV

The defendants continue to argue that the plaintiffs filed an untimely notice of appeal, and that we therefore are without jurisdiction to entertain this appeal. On this point, we are persuaded by the panel's reasoning and conclusion that this appeal is properly before us. We therefore reinstate that portion of the panel's opinion. *See Rubin,* 110 F.3d at 1250–53.

### V

For the foregoing reasons, the judgment of the district court is REVERSED and the case is REMANDED to the district court for further proceedings consistent with this opinion.

KENNEDY, Circuit Judge, dissenting.

Because I believe that Barnhart had no duty to disclose to plaintiffs MDI's possible defaults with Star Bank and that Rubin and Cohen's reliance on Barnhart's statements was reckless, I must respectfully dissent from the majority opinion. The majority opinion examines two theories presented by the plaintiffs to support their claim of securities violations: omissions of material fact and misrepresentations.[1] I, as well, examine the two theories in turn.

---

1. While for purposes of the posture of this appeal, we must assume that the statements plaintiffs allege as misrepresentations were uttered by

Barnhart, the defendants have denied throughout these proceedings that Barnhart spoke with plaintiffs about MDI's relationship with Star

To begin, while the majority correctly states the rule that where a plaintiff alleges a securities violation based on omissions of material facts, reliance may be presumed, I believe the law recognizes that an attorney for a party's duty to disclose is fundamentally different from a lay person's duty to disclose material facts.

The courts, including our own, that have considered claims against attorneys for securities violations in the context of their representation of the issuer of stock have focused, as I believe we should here, on the absence of a fiduciary relationship between the plaintiff and the attorney and the purpose for which the attorney was hired. In particular, the United States Courts of Appeal for the Fourth and Ninth Circuits have made such distinctions. In *Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir.1991), the Fourth Circuit held that the silence of an attorney does not give rise to a securities violation absent a duty to disclose. *Id.* at 990. In *Schatz*, MER Enterprises, purchased an eighty percent interest in two companies owned by the plaintiffs. As payment for the eighty percent interest, plaintiffs received $1.5 million in promissory notes issued by MER. In accepting the notes, the plaintiffs relied on a financial statement and an update letter delivered at closing indicating that the net worth of Mark Rosenberg, the creator of MER, exceeded $7 million. The financial documents failed to disclose that Rosenberg's largest company had filed for bankruptcy and that Rosenberg himself had filed for bankruptcy. Rosenberg and his entities were represented by a law firm named as a defendant in the suit. *Id.* at 488. The plaintiffs alleged the law firm violated Section 10(b) by remaining silent when it knew that Rosenberg was financially insolvent.

Noting that "[s]ilence, absent a duty to disclose, does not violate section 10(b) and Rule 10b–5," the court framed the issue for its determination as whether "federal securities laws impose upon an attorney a duty of disclosure to third parties who are not the attorney's clients." *Id.* at 490. Recognizing that a duty to disclose arises only where " 'a fiduciary or other similar relation of trust and confidence' " exists between parties, the court held that a lawyer or law firm is not liable for failing to disclose information about their client to a third party unless some fiduciary or other confidential relationship exists with the third party. *Id.* at 490. Because no fiduciary or confidential relationship existed between the law firm and the plaintiffs in *Schatz*, the court refused to hold the firm liable under Section 10(b). The court carefully distinguished the facts before it from cases where an attorney issues a misleading legal opinion and from cases where an attorney drafts false prospectuses or other securities documents and therefore makes affirmative misrepresentations in connection with the solicitation of securities. *Id.* at 491–92.

In *Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646 (9th Cir.1988), investors contended a law firm violated section 10(b) by failing to include, in a title opinion regarding property purchased by the investors, that another party had an interest in the same property and that the law firm represented the interested party. *Id.* at 653. After stating the rule that the law firm need have only included the omitted information if it had a duty to disclose it, the Ninth Circuit concluded the law firm had no duty to disclose in light of the following facts. First, the law firm was retained only to determine the marketability of the title and, therefore, the only duty owed the plaintiff concerned the issue of marketability. Second, the plaintiff had equal access to the records examined by the law firm, and lastly, the law firm did not initiate the transaction in securities. *Id.* at 654.

Our Court's decision in *Molecular Technology v. Valentine*, 925 F.2d 910 (6th Cir.1991), similarly focused on the purpose for which an attorney was hired in holding that a triable fact issue existed as to whether an attorney was liable under section 10(b)/rule 10b–5. In *Molecular Technology*, Donovan Snyder, an

---

Bank. In fact, the plaintiffs' complaint and amended complaint made no mention of any statements uttered by Barnhart. It was not until Schottenstein, Zox & Dunn and Barnhart filed a

motion for judgment on the pleadings that plaintiffs submitted the affidavits of Rubin and Weiss, the plaintiffs' counsel, alleging that Barnhart made four misrepresentations to plaintiffs.

attorney, was hired by SDE Robotics and Automation Company to prepare an offering circular and the offering circular itself was misleading.[2] We concluded that, as the preparer of the offering memorandum, Snyder had a duty to disclose material information relating to the offering of the securities for purchase. *Id.* at 918. Unlike *Molecular Technology,* the information Rubin and Cohen allege should have been disclosed to them did not relate to the purpose for which Barnhart was hired. MDI hired Barnhart to draft an opinion letter stating the law firm's opinion as to whether the investment was within MDI's corporate powers and whether the note was authorized by MDI, validly executed and delivered, and enforceable against MDI. The scope of the attorney's duties, thus, did not include informing investors of the status of loans made by a bank to the borrower.

Some guiding principles can be gleaned from *Molecular Technology, Schatz,* and *Roberts.* First, an attorney may be liable for securities fraud where there exists a confidential or fiduciary relationship between the attorney and the third party. Here, as in *Molecular Technology, Schatz,* and *Roberts,* there is no confidential or fiduciary relationship. Second, courts are inclined to hold counsel liable where the attorney omits material information directly relevant to the specific purpose for which the attorney was hired. *See, e.g., Kline v. First W. Gov't Secs., Inc.,* 24 F.3d 480, 490 (3d Cir.1994). As aforementioned, Barnhart was hired only to draft an opinion letter stating the law firm's view as to whether the investment was within MDI's corporate powers and whether the note was authorized by MDI, validly executed and delivered, and enforceable against MDI. The scope of the attorney's duties, thus, did not include informing investors of the financial stability of the borrower. Specifically, the status of loans to MDI from Star Bank was not relevant to those issues

upon which Barnhart was hired to issue an opinion. Thus, in my view, liability cannot be premised on Barnhart's failure to speak where he had no duty to speak.

I have elaborated on the circumstances triggering an attorney's duty to disclose because the majority opinion is unclear as to whether it holds that an attorney has a duty to disclose absent a fiduciary relationship or where the attorney omits material information directly relevant to the specific purpose for which the attorney was hired. The opinion first states that "[u]nder the long-established precedent of this circuit, the conversations between Barnhart and the plaintiffs clearly were instances of 'direct contacts' sufficient to give rise to a duty to disclose." At the same time, the majority acknowledges that while "an attorney representing the seller in a securities transaction may not always be under an independent duty to volunteer information about the financial condition of his client," he does "assume a duty to provide complete (and completely) truthful information with respect to subjects on which he undertakes to speak." Under either a silence scenario or a material omissions scenario, the majority has imposed upon attorneys involved in securities transactions a duty that is unworkable. While the majority contends that attorneys should not be distinguished from other professionals and individuals, I disagree in light of the unique duty of confidentiality attorneys owe to their clients. What is an attorney to do when he possesses information learned from his client relative to an impending deal? Under the majority rule, if the attorney spoke on any matter not directly related to the purpose for which the attorney was hired, the attorney would have to disclose any other relevant information to the investor in violation of his ethical duty to keep his clients' matters confidential. I would not adopt such a rule.

One further clarification is needed. While plaintiffs' complaint alleges only silence or

---

2. Specifically, the offering circular failed to disclose that

> 60,000 shares (representing about 90% of the outstanding shares) of State Die [the predecessor company to SDE] were in escrow; ... that the title to the real property of State Die, which was part of the consideration in the

> merger with Extra Production, was held by an unrelated leasing company and, thus, not transferable ... and ... that State Die had substantial debts, including one $194,000 bank debt.

> *Id.* at 918.

material omissions, plaintiffs' response to defendants' motion for judgment on the pleadings included affidavits attesting that false statements were made upon which they relied. One or more of those statements were misrepresentations for which defendants could be liable. While Barnhart denied making the statements and the pleadings were not amended to allege misrepresentations, the district court considered the misrepresentation theory of liability. Thus, whether defendants were entitled to summary judgment turns on whether plaintiffs recklessly relied on Barnhart's alleged misrepresentations and not on whether Barnhart had a duty to disclose possible defaults or whether Barnhart uttered statements seemingly true but ultimately false due to the omission of material information.

Turning then to the plaintiffs' theory that Barnhart uttered misrepresentations to the plaintiffs, I disagree with the majority's conclusion that the plaintiffs' reliance on Barnhart's statements was not reckless. Whether a plaintiff has justifiably relied on a misrepresentation is judged by a recklessness standard in our Circuit. *See Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 918 (6th Cir.1991). In *Molecular Technology*, we cited the following eight factors which should be considered in determining whether reliance is reckless:

(1) The sophistication of expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.*

Examining each of the factors, I can arrive only to the conclusion that the plaintiffs' reliance was reckless. Rubin was not only a sophisticated investor,[3] but he was also represented by sophisticated counsel, there was

no longstanding business or personal relationship between Rubin and Barnhart, Rubin had access to the relevant information, no fiduciary relationship existed, there was no attempt to conceal the fraud, Rubin initiated the stock transaction, and Barnhart's representations were of a general nature. While the majority proposes that Rubin did not have access to the relevant information and therefore the reliance was not reckless, a close examination of the facts reveals that Rubin's haste in closing this transaction impeded his ability to learn some of the relevant information. First, the default provisions that Star Bank relied upon were in the loan agreements between MDI and Star Bank. Plaintiffs asked the Todds for the loan documents but went ahead with the loan prior to receiving the documents from the Todds. Second, Rubin requested MDI's audited financial statements but did not wait for them either. Further, I believe reliance was reckless because the plaintiffs did not even attempt to contact Star Bank to inquire about the status of loans to MDI. Plaintiffs knew this company was in serious financial trouble. While in its first two years of business, MDI experienced significant growth, its gross revenues dramatically decreased when, in 1991, an article in the New England Journal of Medicine questioned the effectiveness of its product, TENS. The Todds informed Rubin and Cohen that MDI would need $150,000 additional capital in order to proceed with its business plans and offered to sell a thirty-three percent equity interest in the corporation for only $3,300. Given the sophistication of these investors, the Todds' explicit disclosure that the plaintiffs' loan and stock purchases would allow the company to continue its business, and the remarkably low sale price of such a large portion of the company, warning bells should have sounded that a company suffering, as was MDI, might be running into trouble with its bank. This is particularly so because plaintiffs were represented in this transaction by their own sophisticated attorney. If warning bells did not sound for plaintiffs, their lawyer should have at least been sufficiently alerted to

---

**3.** Rubin attested in his affidavit that he has "invested several million dollars in various compa- nies."

prompt him to conduct his own due diligence investigation into MDI's relationship with Star Bank.

I agree with the majority that we cannot know whether Star Bank would have disclosed the default to Rubin; however, had Rubin inquired of the Bank and had it declined to disclose information regarding MDI, he would have at least demonstrated some attempt to exercise due diligence. The majority, in fact, concedes that "... Rubin and Cohen's behavior might be thought reckless in the context of a multimillion-dollar securities purchase ..." Although it might have been even more reckless to invest several million dollars, the $153,000 investment at issue here is not insignificant. While the majority proposes that "[t]here is no rule that requires a single, constant level of due diligence in every business transaction regardless of size," there is similarly no rule that the determination of whether investors have recklessly relied on misrepresentations should rise or fall on the monetary value of the transaction. Yet, the majority has effectively imposed an additional factor, the dollar amount of the transaction, to the eight-factor test established by our Court in *Molecular Technology*. While I might be persuaded that a court ought to consider whether a purchase of securities was a significant or insignificant investment, I cannot agree to a rule that would judge recklessness by the amount of the transaction.

I would hold that plaintiffs, who were investing in what they knew to be a financially troubled company, acted recklessly in failing to examine audited financial statements, review loan documents, and contact the financial institution with whom the company transacted business, before purchasing securities and infusing capital into the company. Accordingly, I would affirm the judgment of the District Court granting summary judgment to the defendants.