*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0199p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GREGORY ZALUSKI; WILLIAM COLEMAN; ALEX
REICHMAN; RICHARD M. PRICE; EDWARD S. PRICE;
MARIA CRISTINA JONES; EDWARD G. NOLTE,
Individually and on Behalf of all Others Similarly
Situated,

　　　　　　　　　　　*Plaintiffs-Appellants,*

　　　　*v.*

UNITED AMERICAN HEALTHCARE CORPORATION;
OSBIE HOWARD; WILLIAM BROOKS; TOM GOSS;
STEPHEN HARRIS; GREGORY H. MOSES, JR.;
WILLIAM E. JACKSON, II,

　　　　　　　　　　　*Defendants-Appellees.*

No. 07-1298

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 05-72384; 05-72112—Lawrence P. Zatkoff, District Judge.

Argued:  March 20, 2008

Decided and Filed:  May 27, 2008

Before:  COLE, GIBBONS, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:**  John M. Lambros, LAW OFFICE OF JOHN M. LAMBROS, New York, New York,
for Appellants.  Laurie J. Michelson, BUTZEL LONG, Detroit, Michigan, Richard E. Zuckerman,
HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellees. **ON BRIEF:**
John M. Lambros, LAW OFFICE OF JOHN M. LAMBROS, New York, New York, for Appellants.
Laurie J. Michelson, David F. DuMouchel, BUTZEL LONG, Detroit, Michigan, Michael Francis
Smith, BUTZEL LONG, Washington, D.C., Richard E. Zuckerman, Douglas Cory Salzenstein,
HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, Lara Fetsco Phillip,
HONIGMAN, MILLER, SCHWARTZ & COHN, Bloomfield Hills, Michigan, for Appellees.

———————————

**OPINION**

———————————

R. GUY COLE, JR., Circuit Judge.  Gregory Zaluski, William Coleman, Alex Reichman, Richard M. Price, Edward S. Price, Maria Cristina Jones, and Edward G. Nolte (collectively, "Plaintiffs") brought this class-action suit against United American Healthcare Corporation ("UAHC"), Osbie Howard, William Brooks, Tom Goss, Stephen Harris, Gregory H. Moses, Jr., and William E. Jackson (collectively, "Defendants").  Plaintiffs allege that Defendants failed to disclose that UAHC was making illegal payments to then-Tennessee Senator John Ford in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Act"), codified at 15 U.S.C. § 78j, and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.  Plaintiffs also brought claims against the individually named Defendants pursuant to Section 20(a) of the Act of 1934, codified at 15 U.S.C. § 78t(a).  The district court granted Defendants' motion, under Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiffs' complaint.  For the following reasons, we **AFFIRM**.

**I. BACKGROUND**

Plaintiffs brought this class-action suit on behalf of individuals and entities who purchased UAHC securities during the period from May 26, 2000, through April 22, 2005, to recover damages following the decline in the value of UAHC securities.  Plaintiffs allege that the damages result from Defendants' failure to disclose the fact that payments were made to Senator Ford and that these payments violated UAHC's contract with the State of Tennessee.

For purposes of reviewing the district court's grant of Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept as true Plaintiffs' allegations.  Therefore, the following facts are taken from the complaint:

> Omnicare is a wholly owned subsidiary of UAHC.  Compl. ¶ 19.  UAHC manages the operations of Omnicare.  *Id.* ¶ 20.

> TennCare is owned and operated by the State of Tennessee.  *Id.* ¶ 21.  TennCare extended health care coverage to uninsured and uninsurable persons who were not eligible for Medicaid.  *Id.*  Enrollees are free to choose the [Managed Care Organization ("MCO")] they wish among those available in the area in which they live.  *Id.*

> Omnicare provides MCO services to TennCare pursuant to a contract with the State of Tennessee to participate as an MCO in the TennCare program.  *Id.* ¶ 23.  The contract is called the Amended and Restated Contractor's Risk Agreement (the "CRA") between the State of Tennessee, d/b/a/ TennCare, and OmniCare. *Id.*

> From 1999 to November 2002, OmniCare represented about 75% of UAHC's revenue and earnings.  *Id.* ¶ 24.  Since November 2002, OmniCare (through the CRA) has accounted for nearly one hundred percent (100%) of UAHC's annual revenue and earnings and represents UAHC's primary asset.  *Id.*

> John Ford was, during the Class Period, an elected Tennessee State Senator who sat on three legislative committees with TennCare oversight.  *Id.* ¶ 25.  UAHC issued a press release on April 15, 2005 admitting to having hired Senator Ford as a consultant since at least 2001.  *Id.* ¶ 27.  UAHC has subsequently admitted to making 42 monthly payments to Senator Ford of approximately $10,000 a month for a total of $420,000 - before terminating the contract on March 11, 2005.  *Id.* ¶ 28.

Section 4-11 of the CRA prohibits [UAHC] from offering or giving gratuities of any kind to any officials or employees of the State of Tennessee. *Id.* ¶ 29. Payment of any such gratuity permits TennCare to terminate the CRA. *Id.* The CRA at section 4-7 also specifically prohibits [UAHC] from either directly or indirectly paying to any officer or employee of the State of Tennessee any wages, compensation, or gifts in exchange for acting as an officer, agent, employee, subcontractor or consultant to OmniCare without approval from TennCare. *Id.* ¶ 30. [UAHC never] sought or obtained the approval of TennCare to make the admitted payments to Senator John Ford, in direct violation and breach of the CRA. *Id.* ¶ 31. The CRA also specifically prohibits [UAHC] from using any of the revenue earned from the CRA to pay the expenses of lobbyists. *Id.* ¶ 33.

Under section 4-2.b. of the CRA, in the event OmniCare . . . engages in any act prohibited or restricted by the CRA, TennCare may immediately declare a default and terminate the CRA and may recover actual damages, including incidental or consequential damages, any other remedy at law or equity and all liquidated damages provided for in the CRA. *Id.* ¶ 34.

The amended and restated CRA signed by OmniCare and submitted to TennCare each year during the Class Period contained material misrepresentations of fact. *Id.* ¶ 38. The OmniCare payments to Senator Ford demonstrate that OmniCare made a material misrepresentation in breach of the warranties in Section 4–7, 4-11, and 4-12 of the CRA. *Id.* [T]he 42 payments to Senator Ford subjected OmniCare to penalties of up to $4.2 million. *Id.* ¶ 41. [T]he payments by OmniCare also subjected the CRA to immediate termination by TennCare, as well as permitted the State of Tennessee to place OmniCare under Administrative Supervision, events that would have a catastrophic impact on UAHC and its share price. *Id.* ¶ 42.

On April 15, 2005, the Company [issued a press release acknowledging the payments but maintaining that the agreement with Senator Ford was lawful and complied with the provisions of the TennCare contract.] *Id.* ¶ 106.

On April 20, 2005, the Tennessee Commissioner of Commerce and Insurance . . . issued an Order placing OmniCare under Administrative Supervision . . . because of violations of the CRA and submission of false information and the making of false statements to TennCare. *Id.* ¶ 45.

On April 21, 2005, news of the Order caused UAHC's stock price to immediately drop from about $5.50 to $2.11 in heavy trading damaging investors. *Id.* ¶ 46. On April 21, 2005, the Company issued a press release [acknowledging the Order and stating that UAHC plans on defending against the allegations in the Order]. *Id.* ¶ 108.

Since then, the Tennessee Legislature, TennCare, and the Tennessee Department of Insurance has been investigating the payments by OmniCare to Senator Ford and hotly debating whether or not to terminate the CRA with OmniCare. *Id.* ¶ 46.

Despite the alleged breaches listed above, the CRA was renewed later in 2005, the period of Administrative Supervision has expired, and the State of Tennessee has not declared any breach of contract by UAHC.

Plaintiffs allege that UAHC submitted statements to the Securities and Exchange Commission ("SEC") in violation of relevant Generally Accepted Accounting Principles ("GAAP") and that such statements "are presumed to be misleading or inaccurate, despite footnotes and

disclosures." Compl. ¶ 47 (citing 17 C.F.R. § 210.4-01(a)(a)). Plaintiffs additionally allege violations of GAAP's Financial Accounting Standards ("FASB"s) Nos. 5, 5.10, and 5.38, which require disclosure of contingencies where there is either certain loss or a "reasonable possibility that a loss or an additional loss may have been incurred," as well as disclosure of unasserted claims and assessments where there is a probability that such a claim may be filed. *Id.* ¶¶ 48-50. Plaintiffs' Complaint continues:

> Public disclosure of these payments by OmniCare has resulted in numerous criminal and civil investigations by the U.S. Attorney, the Tennessee Attorney General, TennCare, the Tennessee Department of Insurance and other bodies. *Id.* ¶ 55. Under the circumstances, as a public company, UAHC knew that its actions would definitely have serious adverse consequences. *Id.* Due to the failure to accrue for or disclose losses associated with the contract breaches, UAHC presented its financial results and statements which violated GAAP. *Id.* ¶ 56.

Plaintiffs next allege that statements made by Defendants in SEC Forms 10-K and 10-Q constitute material misrepresentations that are actionable. They allege that the filed forms were "false and misleading for omitting to state that OmniCare had breached the CRA, that the CRA was currently subject to immediate termination by TennCare, and that OmniCare was subject to substantial monetary penalties as a result of its breaches of the CRA." *E.g. id.* ¶ 97. The 10-Ks were additionally alleged to be misleading:

> [The forms] stated that UAHC's operations are subject to substantial regulation by the state and that its license to operate is subject to suspension or revocation if there is a determination that the plans are operating out of compliance with the law, while omitting to state the material facts that OmniCare was currently in violation of Tennessee law; that it was breaching the CRA, that the CRA was subject to immediate termination and OmniCare subject to administrative supervision; and that OmniCare's certificate of authority to operate in Tennessee was subject to termination. *Id.* ¶ 62.

The Complaint next alleges facts attempting to support liability on the part of individual Defendants under Section 20(a). However, because we conclude below that the forgoing allegations do not give rise to liability under Section 10(b), the claims against the individual Defendants pursuant to Section 20(a) necessarily fail and we need not consider those claims. *See, e.g. PR Diamonds, Inc., v. Chandler*, 364 F.3d 671, 696-98 (6th Cir. 2004).

On January 30, 2007, the district court granted Defendants' motion to dismiss, concluding that Plaintiffs failed to state a cause of action under the heightened pleading requirement for Section 10(b) and Rule 10b-5. *In re United Healthcare Corp. Sec. Litig.*, No. 2:05-CV-72112 (E.D. Mich. Jan. 30, 2007). Plaintiffs timely appealed.

## II. DISCUSSION

We review de novo the district court's grant of Defendants' Rule 12(b)(6) motion to dismiss. *Robert N. Clemens Trust, et al. v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 845 (6th Cir. 2007). A claim survives this motion where its "[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1959 (2007). "In reviewing a Rule 12(b)(6) motion to dismiss, [we treat] all well-pleaded allegations in the complaint as true, and [we] find dismissal proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief." *Downie v. City of Middleburg Heights*, 301 F.3d 688, 693 (6th Cir. 2002) (internal citations omitted). "[W]hen a complaint adequately states a claim, it

may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atl.*, 127 S.Ct. at 1970. We must also "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). In doing so, however, the Court does not accept "the bare assertion of legal conclusions" as enough, nor does it "accept as true . . . unwarranted factual inferences." *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997). Further, we may affirm the district court's dismissal of Plaintiffs' claims on any grounds, including those not relied on by the district court. *In re Comshare, Inc. Sec Litig.*, 183 F.3d 542, 548-49 (6th Cir. 1999).

**A. The Pleading Standard under Section 10(b) and Rule 10(b)-5**

Section 10(b) of the Securities and Exchange Act of 1934 (the "Act") and Rule 10b-5 "prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *PR Diamonds, Inc.*, 364 F.3d at 680-81 (internal quotations omitted). *See also Tellabs v. Makor Issues & Rights*, 127 S. Ct. 2499, 2507 (2007). Section 10(b) provides, in relevant part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Further, Rule 10b-5, promulgated by the SEC under Section 10(b), provides, in relevant part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. A valid claim under Section 10(b) of the Act and Rule 10b-5 "must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *In re Comshare*, 183 F.3d at 548; *PR Diamonds*, 364 F.3d at 681. The requirement that plaintiffs plead fraud with scienter emerges from Congress' amendment of the Act in 1995. Private Securities Litigation Reform Act (the "PSLRA"), codified at 15 U.S.C. §§ 78u-4 & -5 (1998). The Supreme Court recently clarified the level of scienter required at the pleading stage, holding that "an inference of scienter must be more than merely plausible or reasonable - -

it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2504-05.

## B.  The Alleged Omissions and Misrepresentations Do Not Give Rise to a Duty to Disclose

### 1.        *Standard for Determining Materiality*

Plaintiffs' claim is based "entirely on Defendants' failure to disclose that OmniCare had materially breached the CRA and was thus in immediate risk of losing its sole source of revenue and subject to substantial financial and other penalties." Compl. ¶ 127.  Plaintiffs must prove that this failure to disclose by UAHC was material. *E.g.*, *In re Comshare*, 183 F.3d at 548.  For the purposes of securities fraud cases, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).  That is, a statement is material where there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231-32 (citations omitted).  Once materiality is proved, reliance need not be shown. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972) ("[P]ositive proof of reliance is not a prerequisite to recovery [in a failure-to-disclose case].  All that is necessary is that the facts withheld be material in the sense that a reasonable investigator might have considered them important in the making of this decision.").

However, materiality alone is not enough to place a duty to disclose on a company. *See In re Sofamor Danek*, 123 F.3d at 402.  Further limitations on this duty to disclose are necessary because "corporations might otherwise 'face potential second-guessing in a subsequent disclosure suit,' a regime that would threaten to 'deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public.'" *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (citing *In re Sofamor Danek*, 123 F.3d at 403). In determining whether or not the duty to disclose exists, the *In re Sofamor Danek* Court distinguished between "soft information" and "hard information"; a company has a duty to disclose hard information but not soft information unless other criteria are met. *In re Sofamor Danek*, 123 F.3d at 402.

> Hard information is typically historical information or other factual information that is objectively verifiable.  Such information is to be contrasted with "soft" information, which includes predications and matters of opinion.

*Id.* at 401 (internal quotations and omissions omitted).  "The failure to disclose soft information is actionable only if it is virtually as certain as hard facts." *City of Monroe,* 399 F.3d at 669 (citing *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985)) (internal citations omitted).

In addition to the limitation on liability where information is deemed to be "soft," the PSLRA has provided a safe-harbor provision that generally protects companies from liability when they issue future forecasts:

> [The safe harbor] provision excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance.  A plaintiff may overcome this protection only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as "forward-looking" or lacked meaningful cautionary statements.

*Helwig*, 251 F.3d at 547-48 (citing 15 U.S.C. § 78u-5(c)(1)).  Where a company does disclose that its statement is forward-looking, liability may still attach to the extent that the company made the statement in a misleading manner.  That is, if a company chooses to disclose information about the future, "its disclosure must be full and fair, and courts may conclude that the company was obliged

to disclose additional material facts to the extent that the volunteered disclosure was misleading." *Id.* at 564 (internal quotations and omissions omitted). Therefore, once a company chooses to speak, it must "provide complete and non-misleading information with respect to subjects on which [it] undertakes to speak." *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998). In such cases,

> [t]he question thus is not whether a [company's] silence can give rise to liability, but whether liability may flow from [its] decision to speak . . . concerning material details . . . , without revealing certain additional known facts necessary to make [its] statements not misleading. This question is answered by the text of the [SEC] Rule 10b-5(b) itself: it is unlawful for any person to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . . "

*Id.* at 267 (quoting 17 C.F.R. § 240.10b-5(b)); *see also City of Monroe*, 399 F.3d at 670.

In *City of Monroe*, this Court considered allegations that omissions made in financial statements and a press release were material. The plaintiffs in *City of Monroe* alleged that the defendants were aware of the high rate of tire failure that was occurring, and that officials in other countries were investigating several tire blow-outs attributable to defects in manufacturing, but nonetheless published statements regarding confidence in their product and leadership in the market. 399 F.3d at 671. The plaintiffs argued that these annual statements were actionable because they were made while the defendants were in possession of "specific, adverse information undermining the truth of those statements." *Id.* The statements included that the company's tires were "the best tires in the world," that it had "no reason to believe there is anything wrong with" the tires, that the products demonstrated "global consistent quality," and that successful sales were due to "high regard among automakers for our strengths in product quality." *Id.* However, the *City of Monroe* Court concluded that these statements were immaterial, as they were "best characterized as loosely optimistic statements insufficiently specific for a reasonable investor to 'find them important to the total mix of information available.'" *Id.* at 671 (quoting *In re Ford*, 381 F.3d at 570-71.)

The *City of Monroe* Court did find a single statement made by the defendants in a press release to be actionable. Despite being in possession of internal reports revealing high rates of tire failure and being aware that the company had entered into private settlements with several parties because of the unsafe tire conditions, the company nevertheless stated: "we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires." *Id.* at 672. The Court reasoned that, given that the press release was issued in response to several consumer lawsuits alleging product defects that caused fatalities as well as safety groups' requests that Ford recall all Explorers carrying the tires, "[a] reasonable juror could . . . conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation" *Id.* The Court reached no decision as to whether the defendant "necessarily had an obligation to disclose the various safety and looming regulatory issues" surrounding the tires, but found that "once Firestone elected to make statements such as the statement regarding the 'objective data,' it was required to qualify that representation with known information undermining (or seemingly undermining) the claim." *Id.* at 673 (citing *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) and *In re K-tel Intern, Inc.*, *Sec Litig.*, 300 F.3d 881, 896, 898 (8th Cir. 2002) (quoting *Helwig*, 251 F.3d at 561)).

### 2.    *UAHC's Statements in its SEC Filings*

Plaintiffs argue that the statements made by UAHC in its SEC filings constitute the type of material statements that required disclosure that the company had been making illegal payments to

Ford.   We conclude that the statements made were not material, as they were "loosely optimistic statements" that are not the type that are relied on by investors.  *City of Monroe*, 399 F.3d at 671.

Plaintiffs allege that UAHC made statements that obligated them to disclose the payments to Ford when they made standard disclosures, as required by the SEC, in the Form 10-Ks and 10-Qs filed with the SEC and made available to the public as required by law.  In the SEC filings referenced by Plaintiffs, UAHC referred to the existence of the TennCare contract, the terms of the contract, and the length of the renewed contract, which was 42 months, to last from July 1, 2000 to December 31, 2003.  These statements contained a paragraph that disclosed that the license with Tennessee was subject to "denial, limitation, suspension or revocation if there is a determination that the plans are" not complying with the contract or statutes, or failing to provide the care expected under the contract.  The filings referred to the pending expansion into new areas of Tennessee and the resulting increase in subscribers for UAHC.  While many of the statements also made reference to "future annual increases in average premiums to be determined by the State of Tennessee," such statements were accompanied by the disclosure that "[s]uch increases are in lieu of the quarterly adverse selection payments previously made to compensate managed care organizations . . . ." Similarly, references to "increased capitation rates" were accompanied by statements that the change resulted from the elimination of "the practice of providing retroactive payments."

These statements are not the type of misleading statements that give rise to a duty to disclose; they are accurate portrayals of the status of the company and its operations inside Tennessee. Plaintiffs argue that UAHC's failure to disclose the payments to Ford resulted in a breach because as a result of those payments, Tennessee could choose to sanction UAHC or terminate the CRA. However, as in *In re Sofamor Danek*, while the payment to Ford could arguably have been a piece of hard information that was subject to disclosure, the potential consequences of these payments are the type of predictions and soft information that do not give rise to a duty of disclosure. 123 F.3d at 402.  Further, the evidence of internal investigations and reports that gave rise to a duty to disclose in *Helwig* and *City of Monroe* are not present here; there is no evidence that UAHC anticipated that the Ford payments would lead to a termination or modification of its contract with TennCare.  *See Helwig*, 251 F.3d at 554-55 (release of statements that company was comfortable with profit predictions required disclosure of developed analysis showing that the company actually expected significantly lower levels of earnings); *City of Monroe*, 399 F.3d at 672 (release of statement of confidence in safety of tires required release of evidence in the company's possession demonstrating lack of tire safety).

In addition to the statements repeated throughout the Form 10-Ks and 10-Qs, some of the filings make reference to the viability of the UAHC brand, OmniCare-TN.  For example, in UAHC's October 15, 2002 10-K, the Company stated that:

> Fiscal 2002 was a year of significant changes for OmniCare-TN and the other [MCOs] having contracts with TennCare, a State of Tennessee program that provides medical benefits to Medicaid and working uninsured and uninsurable recipients.  In a climate of continually rising medical costs, several of TennCare's major MCOs ceased doing business in fiscal 2002.  In contrast, TennCare has expressly regarded OmniCare-TN as one of TennCare's viable MCOs.

Compl. ¶ 78.  This statement is most properly described as immaterial puffery, as thoroughly described by the *City of Monroe* Court.  *See* 399 F.3d at 671.  It is further distinguishable from the single statement that the *City of Monroe* Court found to be actionable because, unlike Firestone's knowledge that companies and countries were beginning to doubt the safety of their tires, *id.* at 672, there is no evidence that UAHC was aware that OmniCare was not properly serving its client base. In addition, to the extent that some of these statements may have been made after the Company became aware that the payments to Ford were being investigated, such knowledge does not impute

knowledge of the myriad of potential consequences that could occur as a result of the Ford investigation, and as explained above, UAHC had no duty to disclose what it had not yet discovered or concluded.

Lastly, the August 25, 2004 10-K includes a statement of "Concentration of Risk," which states that "[d]uring the years ended June 30, 2004, 2003 and 2002, approximately 100%, 87% and 91%, respectively, of the Company's revenues were derived from a single customer, [TennCare]. . . ." Compl ¶ 96. This statement is not misleading, as it is an accurate statement of UAHC's revenues. Further, as demonstrated above, the statement does not give rise to a duty to disclose the payments to Ford, as there is no evidence that UAHC internally thought that the contract with TennCare was subject to termination as a result of the payments to Ford.

    3.    *UAHC's Statements in the Press Releases*

The April 15 press release explicitly stated that the payments by UAHC to Ford were for consulting work done outside of Tennessee. This is an affirmative misleading statement, as Plaintiffs have submitted sufficient evidence that UAHC was aware of Ford's actions on UAHC's behalf within the state of Tennessee through the papers found in Ford's desk, the statements of other Tennessee legislators, and the whistle-blowing claims of former UAHC workers. However, Plaintiffs do not allege simply that the payment was made, but that the making of the payment created a voidable contract or the possibility of fines and sanctions by the State of Tennessee. Thus, Plaintiffs' allegation refers to the consequences of the payment, not the payment itself. As stated above, these consequences are the type of predictions and soft information that do not give rise to a duty of disclosure. *In re Sofamor Danek*, 123 F.3d at 402. And, as above, there is no evidence that, at the time the press release was made, UAHC anticipated that the payments would lead to a termination or modification of its contract with TennCare. *See Helwig*, 251 F.3d at 554-55; *City of Monroe*, 399 F.3d at 672.

The April 21 press release issued by UAHC acknowledged the receipt of Tennessee's Notice and Order of Administrative Supervision. It stated that:

> The notice also asserts that its findings of fact describe potential grounds for termination of the Health Plan's TennCare contract. Although the Health Plan and UAHC acknowledge that such termination would have a material adverse effect on the companies, the companies do not agree that these findings are accurate. UAHC plans on aggressively defending the Health Plan against these allegations.

Compl. ¶ 108. The analysis applied to the April 15 press release applies here as well. Plaintiffs argue that UAHC should have disclosed that the payments constituted breach. Such information goes to the potential consequences of UAHC's practice, and as in *In re Sofamor Danek*, UAHC was not required to make such a disclosure. *See* 123 F.3d at 401-02.

Further, the statements made in these press releases can be distinguished from those found to be material by the *City of Monroe* Court.   In *City of Monroe*, once the company chose to speak regarding an objective fact, "it was required to qualify that representation with known information undermining (or seemingly undermining) the claim." 399 F.3d at 673. (citing *Mayer*, 988 F.2d at 639 and *In re K-tel Intern*, 300 F.3d at 896, 898 (quoting *Helwig*, 251 F.3d at 561)). This objective fact did not turn on decisions made by external parties, such as whether to fine the company for violations of safety standards, but on a statement that was directly in conflict with data in the company's possession. In *City of Monroe*, the defendants issued a statement that "the objective data clearly reinforces our belief that these are high-quality, safe tires"; the defendants in fact had data that indicated the opposite. *Id.* at 672. In contrast, the complained-of omission in this case is that

payments made to Ford could have resulted in Tennessee's decision to void the contract or fine the company. There is no evidence that UAHC believed either of these actions to be forthcoming.

We conclude that in this setting, Defendants' failure to disclose the potential consequences of the payments to Ford, consequences which turn on decisions made by actors outside of Defendants' control, did not constitute the type of hard information that this Court considers to be actionable. *See In re Sofamor Danek*, 123 F.3d at 398-401.

4.       *UAHC's Statements with respect to GAAP*[1]

Plaintiffs allege that statements made in their financial statements, including the Form 10-Ks and 10-Qs referred to above, were "materially false and misleading because the Company failed to either record or disclose the loss contingency associated with the repeated breaches of contract" as required by GAAP. Compl. ¶ 51. However, "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare*, 183 F.3d at 553. As in all other allegations of securities violation, Plaintiffs must show a strong inference of scienter regarding UAHC's omissions or misrepresentations. *See id.* Prior to demonstrating scienter, Plaintiffs must show that UAHC violated GAAP and that such a violation was material.

"GAAP, via FASB 5, requires that loss be accrued whenever it is probable a loss has been incurred or an asset impaired and the amount of the loss can be reasonably estimated. If the loss is at least reasonably possible, but no reasonable estimate can be made, the contingency at a minimum should be disclosed." *City of Monroe*, 399 F.3d at 677-78 (internal quotations omitted). Thus, if a statement is issued and states that it is in accordance to GAAP, "[t]he unmistakable representation . . . [is] that if a loss or asset impairment was probable, the Annual Report reader would see a discussion of it in some form in the report. A fortiori then, the Report included the representation that if there were a substantial certainty of such an impairment, that contingency or risk would be disclosed." *Id.* at 678. In *City of Monroe*, the Court ultimately concluded that, given the circumstances in which the reports were made, it was misleading to fail to disclose the emerging evidence that the tires were not safe, as well as the resulting lawsuits for injuries that were beginning to be filed.

As in *City of Monroe*, the financial statements contained no reference to the impairment or likelihood of impairment to the contract. Plaintiffs here allege that the knowledge that employees had been fired as a result of their discussion of the Ford payments, and the knowledge that disclosure of the payments could result in investigations by Tennessee, gave rise to a duty to disclose potential losses that might occur as a result of the Ford payments. However, knowledge of the payments to Ford, the termination of an employee who subsequently filed a whistleblower action, and the potential for investigation does not give rise to a "probability" of impairment, the standard the GAAP uses when determining whether disclosure is necessary. In *City of Monroe*, there was such a finding of probability: by the time the financial statements were filed, the companies had received "thousands of claims for and complaints" concerning tire failures, the company was aware of "investigations and scrutiny" by the Arizona and Venezuelan governments, and the companies discussed "[t]hese claims, suits and payments . . . at least quarterly from 1997 to 1999" in meetings among company executives. 399 F.3d at 678-79. No such showing of probability has been made here, and the statements are therefore not actionable.

_____

[1]Plaintiffs argue that this issue is not properly before the Court, that UAHC waived the issue when it did not explicitly move for a motion to dismiss as to this claim, and that the district court erred when it did not act on Plaintiffs' motion to strike or motion for leave to file a surreply. However, the GAAP claim is pleaded as a subset of the 10b-5 claim, and thus UAHC's motion to dismiss encompassed the entirety of the claim.

### III. CONCLUSION

For the reasons above, none of Plaintiffs' allegations give rise to a cause of action under the Act or Rule 10b-5. Accordingly, we **AFFIRM** the district court's grant of Defendants' 12(b)(6) motion to dismiss.