*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0370p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

INDIANA STATE DISTRICT COUNCIL OF
LABORERS AND HOD CARRIERS PENSION AND
WELFARE FUND, On Behalf of Itself and All
Others Similarly Situated, et al.,
          *Plaintiffs-Appellants,*

ALASKA ELECTRICAL PENSION FUND, On
Behalf of Itself and All Others Similarly
Situated,
          *Intervenor-Appellant,*

    *v.*

OMNICARE, INC.; JOEL F. GEMUNDER; DAVID
W. FROESEL, JR.; CHERYL D. HODGES;
EDWARD L. HUTTON; and SANDRA E. LANEY,
          *Defendants-Appellees.*

No. 07-6379

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 06-00026—William O. Bertelsman, District Judge.

Argued: September 18, 2008

Decided and Filed: October 21, 2009

Before: DAUGHTREY and GILMAN, Circuit Judges; MILLS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Eric Alan Isaacson, COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP, San Francisco, California, for Appellants. Harvey Kurzweil, DEWEY
& LeBOEUF LLP, New York, New York, for Appellees. **ON BRIEF:** Eric Alan
Isaacson, Henry Rosen, Jennifer L. Gmitro, Shirley H. Huang, COUGHLIN STOIA
GELLER RUDMAN & ROBBINS LLP, San Francisco, California, Kevin L. Murphy,

_____

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois,
sitting by designation.

GRAYDON HEAD & RITCHEY, LLP, Fort Mitchell, Kentucky, for Appellants. Harvey Kurzweil, William T. Conway III, Richard W. Reinthaler, James P. Smith III, DEWEY & LeBOEUF LLP, New York, New York, John E. Schreiber, DEWEY & LeBOEUF LLP, Los Angeles, California, Douglas R. Dennis, Stephen M. Gracey, FROST BROWN TODD LLC, Cincinnati, Ohio, William T. Robinson III, FROST BROWN TODD LLC, Florence, Kentucky, for Appellees.

––––––––––––––––

**OPINION**

––––––––––––––––

MILLS, District Judge.  Seizing on a few vague statements from management, the plaintiffs try to turn bad corporate news into a securities class action.

Because the Private Securities Litigation Reform Act ("PSLRA") forbids such alchemy, we generally affirm the district court's dismissal, although we reverse its disposition regarding the claims brought under the Securities Act of 1933, 15 U.S.C. § 77k.

## I.   BACKGROUND

### A.     General Information

Defendant Omnicare, Inc. is the nation's largest provider of pharmaceutical care for the elderly, handling medication distribution for nearly 1.5 million patients across most states and in Canada.  Reflecting the size of its operations, Omnicare's pharmacy services generated $5.3 billion in net sales in 2005 alone.[1]

The plaintiff class (Plaintiffs) consists of Omnicare investors who purchased securities between August 3, 2005, and  July 27, 2006.  The Laborers Council was selected as lead plaintiff under the PSLRA.  *See* § 21D(a)(3)(B), 15 U.S.C. § 78u-4(a)(3)(B).  It purchased Omnicare securities throughout December 2005 and January 2006, and sold all of them at the end of January 2006.

––––––––––––––––

[1]Technically, Omnicare is comprised of two business segments: Pharmacy Services and Contract Research Organization Services.  But this detail may largely be ignored since 97% of Omnicare's revenue comes from Pharmacy Services.

Also implicated in this case are several individual defendants.  Three of these defendants are officers of Omnicare: CEO, President, and Director Joel Gemunder, CFO and Senior Vice President David Froesel, and Secretary and Senior Vice President Cheryl Hodges.  The remaining individual defendants are board members: Chairman Edward Hutton and Director Sandra Laney.

Plaintiffs allege that the defendants committed fraud in violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, as well as Rule 10b-5, 17 C.F.R. 240.10b-5.  Plaintiffs also allege liability for Gemunder, Froesel, and Hodges under § 20(a), 15 U.S.C. § 78t(a), and liability for all defendants under § 11 of the Securities Act of 1933 ("SA"), 15 U.S.C. § 77k.

The parties pull four sets of § 10(b) fraud claims out of Plaintiffs' sprawling and repetitive First Amended Consolidated Complaint.  Briefly, these claims concern misleading statements or omissions relating to: (1) Medicare Part D preparedness, (2) a contract dispute with United Health Group (UHG), (3) violations of Generally Accepted Accounting Principles (GAAP),  and (4) the legality of Omnicare's alleged drug recycling program and drug substitution program.  The claim under § 11 also relates to the alleged GAAP violations.  We summarize each set of claims in turn.

### B.     Medicare Part D Preparedness

In 2003, the Medicare Prescription Drug, Improvement and Modernization Act created Medicare Part D, a voluntary prescription drug benefit program for seniors. Under this program, private entities (typically insurance providers) contract with the Centers for Medicare and Medicaid Services ("CMS"), a division of the Department of Health, to offer approved prescription drug plans ("PDP").  Pharmacies such as Omnicare contract with the PDP providers to supply the enrollees with the required prescription drugs.  The PDP providers are compensated through a combination of enrollee premiums and reimbursement for the drugs provided (at an 8% mark up) from the CMS.

In late 2005, Omnicare was preparing for the industry's transition to Medicare Part D on January 1, 2006. Plaintiffs aver that Omnicare, on two separate dates, misled the public about its readiness for this transition on several occasions.

First, in an August 3, 2005, press release, Gemunder stated:

There are still many specifics yet to be determined through sub-regulatory guidance by CMS, as well as the approval of specific PDPs by CMS. . . . All things considered, we see nothing materially adverse about the regulations at this time and believe we are well-positioned to add value under the new Medicare Part D benefit. We will monitor developments and continue to ready our company as the year progresses.

During a conference call on the same day, Gemunder elaborated:

We have been extremely busy in the last couple of months, working with potential PDP's to familiarize them about the specialized services required and the nuances of providing pharmacy services to long-term care residents and negotiating agreements for our participation in their pharmacy networks to serve the long-term care market. . . . [W]e're pretty confident that we're not going to be hurt by moving into the Part D structure, vis-a-vis where we are now.

Second, Plaintiffs allege that Gemunder made further misleading statements on November 2, 2005. In a press release, Gemunder stated:

"We remain highly focused on the upcoming implementation of the Medicare Drug Benefit. While bringing about sweeping change in our industry, we believe we are well-positioned to add value under the new Medicare Part D benefit. . . . As the enrollment process begins, we are busy educating our long-term care facility clients and their residents on the availability and implementation of the new drug benefit . . . ."

Gemunder reiterated these points in a conference call that same day:

"So we have been focused this quarter on training and on educating our employees, and seeing to the operational issues, related to the implementation of the new drug benefit. And with the enrollment period beginning November 15th, we have also been heavily been [sic] engaged in educating our long-term care facility clients and their residents, on the availability of the new benefit, as well as working with them on the implementation process . . . ."

Plaintiffs complain that these statements, and others, were misleading because Omnicare failed to sufficiently monitor developments (including performance of a cross-check of their databases against a national database) and neglected to properly educate the drug-plan suppliers on pharmacy care practices. The result was a rocky transition to Part D, costing approximately $9.8 million in overtime and related expenses.

## C.    UHG Contract Dispute

Next, Plaintiffs assert that Omnicare's positive earnings growth predictions were misleading in light of an undisclosed contract dispute with UHG, a major PDP sponsor. On February 23, 2006, Gemunder commented on the fourth-quarter 2005 results by stating that "as we enter our 25th year as a public company, Omnicare's revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy." In an April 27, 2006, statement regarding Omnicare's first quarter 2006 results, Gemunder repeated that "Omnicare's revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy."

Plaintiffs argue that these statements were false and misleading because Gemunder did not disclose a developing dispute with UHG. UHG, a drug-plan supplier responsible for about a third of Omnicare's Part D business, had recently completed a merger with PacifiCare Health Services, Inc. PacifiCare also had a contract with Omnicare, but it was less profitable. Some time in February 2006, UHG informed Omnicare that, as a result of the merger, it would be withdrawing from its original contract and switching to the less favorable PacifiCare agreement. This change reduced Omnicare's profits for the second quarter of 2006.[2]

Plaintiffs claim that Gemunder's growth predictions were misleading absent a disclosure of this development. The contract dispute was not revealed until May 18,

---

[2] At one point, the complaint states that Omnicare's profits dropped 51%. However, the complaint also quotes a document putting Omnicare's *total* profit decline was at 51% for the quarter. This translated into $30.4 million or 25 cents per share. The complaint goes on to quote the document's conclusion that the loss attributable to UHG's contract switch was $18.3 million or 9 cents per share.

2006, when Omnicare filed suit against UHG.[3]  In response to the filing, Omnicare's stock dropped from \$54.98 to \$50.57.

### D.     GAAP Violations

From the second quarter of 2005, to the first quarter of 2006, Omnicare reported large, sometimes record, revenues.  Commenting on the second quarter revenues, Gemunder stated that "[o]ur sales once again hit record highs, and our operating margins improved on a sequential basis, reflecting the growing benefits of our cost reduction and productivity enhancement initiatives."  Hodges added that revenue per patient was up over prior years.  Similar sentiments were expressed in relation to later quarters and filings certified by Gemunder and Froesel also reflected this revenue growth.

Plaintiffs allege that these statements were misleading because Omnicare's revenue numbers for 2005 and early 2006 were inflated by non-compliance with GAAP. They allege: (1) improper revenue recognition, (2) overvaluation and improper recognition of receivables, (3) overvaluation of inventories, and (4) the failure to establish, in a timely manner, litigation settlement reserves with respect to several government investigations (discussed below).

### E.     False Assurances of Legal Compliance

Finally, Plaintiffs accuse Omnicare of falsely claiming that the company complied with the law when it was involved in two illegal practices: improper drug recycling and improper drug substitution.  As to the former allegations, Plaintiffs say that Omnicare was repackaging and reshipping drugs with varying expiration dates, including some expired drugs.  The latter allegation relates to a scheme to replace cheaper doses of certain medicines with more expensive doses (*e.g.*, capsules for tablets) in order to increase revenue.[4]

---

[3]A district court later granted UHG's summary judgment motion on these claims. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 594 F. Supp. 2d 945 (N.D. Ill. 2009).

[4]Passing references are also made to a scheme to replace generic drugs with brand-name ones. It is unclear where this alleged scheme fits into the Plaintiffs' claims.

In light of these practices, Plaintiffs allege that Omnicare made materially misleading statements on a number of occasions when it assured the public that it was complying with the law. For example, a November 7, 2005, a press release explained that "Omnicare's policy is to comply with all applicable federal and state laws and regulations. To the best of our knowledge, our purchases of pharmaceuticals comply with all applicable laws and regulations and are consistent with Omnicare's goal of providing appropriate pharmaceutical care cost-effectively for the seniors we serve." Similar statements were allegedly made in January and February 2006.

In January 2006, several government raids were conducted on Omnicare facilities. By late 2006, two settlements had resulted. The first involved one of Omnicare's Michigan subsidiaries, Specialized Pharmacy, whose president was charged with fraud. This case was settled for $52.5 million. The second settlement was with the attorney generals of 43 states and involved Omnicare's alleged substitution of dosage forms on several generic drugs (e.g., tablets with capsules). This settlement obligated Omnicare to pay $49.5 million.

### F.    District Court Ruling

Finding the FACC insufficient, the district court granted Defendants' motion to dismiss. The court began with the § 10(b) and Rule 10b-5 claims, dismissing the Part D statements and the GAAP violations for a failure to plead loss causation. Turning to the statements regarding legal compliance, the court noted that loss causation might also be lacking, but dismissed the action on other grounds. First, it held that any statements concerning legality of a company's actions were "soft" statements, for which disclosure was not required. Second, the court discounted the value of the confidential witness testimony in the complaint and held that no strong inference of scienter existed.

With respect to the UHG contract dispute, the Court found that the Laborers Council, the lead plaintiff, had sold its securities before the relevant disclosure and therefore lacked standing. The district court also denied a motion to intervene by Alaska Electrical Pension Fund (a party ostensibly possessing standing), holding that a further

amendment was barred by the PSLRA and, alternatively, concluding that any intervention was futile in light of the lack of scienter.

Next, the district court dismissed Plaintiff's § 11 action. In a footnote, the Court explained: "The Section 11 claim, which also sounds in fraud and is based on the alleged accounting violations, fails on the same grounds [i.e., failure to allege loss causation]."

Having dismissed all claims of primary securities violations, the court rejected application of control-person liability under § 20.

## II. STANDARD OF REVIEW

A district court's grant of a Rule 12(b)(6) motion to dismiss is reviewed de novo. *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (citing *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 845 (6th Cir. 2007)). All well-pleaded facts in the complaint are accepted as true. *Ley v. Visteon Corp.*, 543 F.3d 801, 805 (6th Cir. 2008). "In addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Id.* (quoting *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2008)). Further, we may affirm on any supportable ground, even if the district court invoked other grounds for its ruling. *Id.* at 805-06.

## III. ANALYSIS

### A.    Securities and Exchange Act Claims: 10(b) and Rule 10b-5

'Section 10(b) of Securities and Exchange Act and Rule 10b-5 prohibit fraudulent, material misstatements in connection with the sale or purchase of a security.' *Zaluski*, 527 F.3d at 570 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680-81 (6th Cir. 2004)) (internal quotation marks omitted). A private right of action for violations exists where a plaintiff can demonstrate the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security;

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761, 768 (2008); *see also Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007).

Because § 10(b) claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply. *Frank v. Dana*, 547 F.3d 564, 569-70 (6th Cir. 2008). Thus, the complaint must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id.* at 570 (quoting *Gupta Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998)).

Bolstering this rule of specificity, the PSLRA imposes further pleading requirements. *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007)). First, the complaint must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading." 15 U.S.C. § 74u-4(b)(1). Second, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). *See Frank*, 547 F.3d at 570.

### 1.    UHG Dispute

In order to recover under § 10(b) and Rule 10b-5, a plaintiff must show both an omission or misstatement and its materiality. *Zaluski*, 527 F.3d at 571. Materiality can be established by proof of a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). When a company chooses to speak, it must "provide complete and non-misleading information." *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998). However, liability does not attach to mere corporate puffery or statements of corporate optimism. *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004). Further, a safe-harbor "excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance."

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 547-48 (6th Cir. 2001) (en banc) (citing 15 U.S.C. § 78u-5(i)(1)).  This protection is overcome only "if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." *Id.* at 548 (citing 15 U.S.C. § 78u-5(c)(1)).

With regard to the UHG dispute, Plaintiffs do not explain why, as a general matter, Omnicare had a duty to disclose its contractual dispute with UHG any earlier than it did.  Rather, Plaintiffs focus on a statement made by Gemunder on two occasions: "Omnicare's revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy."  According to Plaintiffs, this predictive statement was misleading absent disclosure of the contract dispute.

The problem with this argument, however, is that Gemunder's comments are forward-looking statements entitled to safe-harbor protection.  Indeed, not only does the statement itself call attention to its predictive character ("growth outlook") but even the complaint identifies it as "a positive outlook on future revenue."  Further, to the extent that the reference to the outlook "remaining" positive implies some present circumstances, that is not enough to take this statement out of the safe harbor. *See Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 676-77 (6th Cir. 2003) (relying on 15 U.S.C. § 78u-5(i)(1)(D) and finding reference to use of term "continuation" in phrase "continuation of outstanding earnings growth" did not transform an otherwise forward-looking prediction into an unprotected mixed statement).

Even putting that exception aside, Gemunder's statements cannot be deemed material.  Courts have consistently found immaterial "a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace - loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important. . . ." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570-71 (6th Cir. 2004) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)).  Gemunder's comments fall squarely within this realm of corporate puffery, as

they do nothing more than vaguely predict positive future results, a claim so banal and ubiquitous that it cannot engender reliance by reasonable investors. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements of optimism about earnings and claim predicting "income growth consistent with . . . historically superior performance" were "puffery").

Therefore, we find that the complaint fails to allege a material misstatement or omission.[5]

### 2.    Part D Implementation

Plaintiffs allege that Gemunder's statements and predictions concerning Omnicare's transition to Part D were misleading in light of Omnicare's allegedly insufficient and untimely training as well as the difficulties encountered in implementation. The district court dismissed this claim, finding that loss causation had not been adequately pled. We agree with that assessment.

In a securities action, the plaintiff bears the burden of proving loss causation, 15 U.S.C. § 78u-4(b)(4), as well as pleading it. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005). "Loss causation requires 'a causal connection between the material misrepresentation and the loss.'" *Brown*, 481 F.3d at 920 (quoting *Dura*, 544 U.S. at 342). Price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *See Dura*, 544 U.S. at 346-47.

Assuming that Gemunder's statements are otherwise actionable, loss causation is thoroughly lacking in this case. Although a number of allegations relate to Omnicare's alleged Part D shortcomings, none explain how the statements were revealed to be false and thereby caused a drop in the stock price. Indeed, the sole "loss causation" allegation identified by the Plaintiffs is a fragment of a sentence imbedded in the complaint's block quote of an article from *TheStreet.com*. The entire sentence reads:

---

[5]Since Alaska Electrical's claims would fail for the same reason, we also affirm the denial of the motion to intervene.

"The institutional pharmacy [Omnicare] has found itself caught up in two government probes *even as it struggles to overcome major glitches associated with the new Medicare Part D drug coverage program.*" (emphasis added). Tellingly, this quote does not appear in the section of the complaint dealing with Part D, but rather in a discussion of loss causation relating to various government raids. Further, the complaint fails to explain why this minor problem, as opposed to the raids, caused the ensuing decline in stock value. *See Dura*, 544 U.S. at 343 ("To 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires."); *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) ("To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries."). Quite to the contrary, the complaint expressly attributes the decline in share price to the confluence of governmental probes, not the news of Part D difficulties. As a result, we cannot conclude that loss causation has been adequately pled with respect to the implementation of Part D.

### 3.    GAAP Violations

Plaintiffs have also failed to plead loss causation under § 10(b) regarding Omnicare's alleged misstatements premised on non-compliance with GAAP. Although Plaintiffs list numerous alleged violations of GAAP rules, the complaint nowhere suggests how or when any of these alleged accounting improprieties were disclosed. Rather, Plaintiffs argue that they were implicitly disclosed because Omnicare's allegedly illegal conduct (drug recycling, etc.) translated into accounting violations. Thus, when news of the government raids appeared, the accounting statements were thrown into question by extension. This causation theory, however, rests entirely on speculation and is substantially undercut both by the lack of any financial restatements on Omnicare's part and by the willingness of third-party auditors to continue to certify Omnicare's GAAP compliance. In short, the complaint does not suggest that the alleged GAAP violations were ever recognized by or revealed to the market. Therefore, loss causation is again lacking.

**4**.    **Legal Compliance**

Finally, Plaintiffs seek recovery based on Omnicare's claims of "legal compliance." Defendants argue that its statements regarding "legal compliance" are not actionable because companies have no duty to opine about the legality of their own actions. As a general matter, that is true. Such information is considered "soft" and, therefore, disclosure is not required. *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401-02 (6th Cir. 1997).

But Plaintiffs object to application of this rule because Omnicare did not stay completely silent; instead, it made several general statements that it complied with state law and regulations and had a policy of complying with the law.[6] Thus, Plaintiffs argue that liability can be imposed based on these statements and that Omnicare had a duty to disclose its involvement in "illegal" activities. We disagree.

In *Kushner v. Beverly Enterprises, Inc.*, the Eighth Circuit reviewed a case very similar to this: a company made a general assertion that it complied with Medicare regulations but was later embroiled in a large Medicare fraud investigation. 317 F.3d 820, 824-25, 830-31 (8th Cir. 2008). Relying on this Court's decisions in *Sofamor Danek* and *Helwig*, the Eighth Circuit assumed that liability could attach to a company's general assertion of legal compliance, but only where the complaint "adequately pleaded that the defendants knew the statements were untruthful." *Id.* at 831. Since no such allegations were made, the pleading was deemed inadequate. *Id.*

This case is no different. Although Plaintiffs claim that Omnicare's "legal compliance" claim was made with knowledge of its falsity, few factual allegations support this claim. Indeed, although three confidential witnesses reported various drug-handling practices that they considered illegal, only the allegations of CW6 suggest any knowledge on the part of any of the defendants. In particular, CW6 asserted that "Froesel would contact Regional CFOs twice each quarter to implement the therapeutic

---

[6]The bulk of these statements come from newspaper articles. We assume, without deciding, that these statements can be sufficiently attributed to Omnicare. *See Raab v. Gen. Physics Corp.*, 4 F.3d 286, 288-89 (4th Cir. 1993).

interchange program where the more expensive branded drugs were substituted for the cheaper and less profitable . . . ." But this does little to aid the Plaintiffs. First, no information is given regarding CW6 except the title of his position. As a result, any inferences drawn from his accusations must be steeply discounted. *Ley*, 543 F.3d at 811. Second, the allegations of illegality in this case relate to drug recycling and an alleged scheme to change forms of dosages (e.g., capsules for tablets), not branded drugs being substituted for generic drugs.[7] Hence, there is a disconnect between what Froesel allegedly knew (branded-for-generic drugs) and what was allegedly revealed to the market (dosage substitutions and recycling). Further, even if this statement did involve drug recycling or dosage substitution, it still fails to show falsity because no allegations establish when the defendants were aware of the wrongdoing or, for that matter, when the wrongdoing was occurring. Thus, as in *Kushner*, the complaint fails specifically to allege that defendants knew their statements of "legal compliance" were false when made.

Nor did Omnicare have a duty to disclose its "illegal" operations based on its "legal compliance" claim. In *Zaluski*, we dealt with a statement claiming not legal compliance, but rather that the company "complied with provisions" of a contract. *Zaluski*, 527 F.3d at 568. The defendant in that case (the parent company of Omnicare) had a contract with the state of Tennessee, prohibiting payments to Tennessee officers or employees; violations could result in fines or the termination of the entire contract. Despite these potential consequences, the defendant made a large number of monthly payments to a Tennessee senator. When the scheme began to unravel, the defendants issued a press release claiming that the payments were made for out-of-state consulting. *Id.* at 567-70.

We found that the press release in *Zaluski* was "an affirmative misleading statement," but nevertheless held that Omnicare did not have to disclose that the payments constituted a breach of contract:

---

[7]CW6 does state that "Omnicare made the switches [from tablets to capsules of Ranitidine] . . . simply to charge a higher price." Nothing, however, suggests who at Omnicare knew of this policy, when they knew, or even when it was in effect.

> The April 15 press release . . . is an affirmative misleading statement .... However, Plaintiffs do not allege simply that the payment was made, but that the making of the payment created a voidable contract or the possibility of fines and sanctions by the State of Tennessee. Thus, Plaintiff's allegation refers to the consequences of the payment, not the payment itself. . . . These consequences are the type of predictions and soft information that do not give rise to a duty of disclosure.

*Id.* at 575-76.

We also noted in *Zaluski* that the statements regarding the contract, though misleading, did not require further disclosures:

> In *City of Monroe*, once the company chose to speak regarding an objective fact, it was required to qualify that representation with known information undermining (or seemingly undermining) the claim. This objective fact did not turn on decisions made by external parties, such as whether to fine the company for violations of safety standards, but on a statement that was directly in conflict with data in the company's possession. In *City of Monroe*, the defendants issued a statement that 'the objective data clearly reinforces our belief that these are high-quality, safe tires'; the defendants in fact had data that indicated the opposite. In contrast, the complained-of omission in this case is that payments made to [the Senator] could have resulted in Tennessee's decision to void the contract or fine the company. There is no evidence that [defendant] believed either of these actions to be forthcoming.

*Id.* at 576.

The *Zaluski* misrepresentation was that the payments to the Senator were for out-of-state work; in other words, the payments to the Senator complied with the contract. Here, Omnicare said even less, merely making a generic claim that they complied with the law without providing *any* specifics and generally refusing to discuss the case. As such, additional disclosures of potential legal findings and consequences would be even less justified here than in *Zaluski*. Further, as in *Zaluski*, the materiality of the alleged omission derives solely from predictions regarding the actions of third parties, particularly whether fines or other sanctions would be brought based on findings of regulatory violations. This information is "soft," and no disclosure is required despite the generalized claim of "legal compliance."

In sum, the complaint does not sufficiently establish that defendants actually knew that the "legal compliance" statements were false when made. Nor did the generic claim of lawfulness, in the absence of any specifics, require the disclosure of the allegedly "illegal" activities. Therefore, we find that the district court properly dismissed this claim as well.

### B.     Securities and Exchange Act Claim: § 20

Plaintiffs also allege that the defendant officers (Gemunder, Froesel, and Hodges) are liable under § 20 of the Securities and Exchange Act , 15 U.S.C. § 78t(a). When a primary violation of securities law is shown, that provision imposes joint and several liability on "controlling persons." However, as discussed above, the district court properly dismissed the Plaintiffs' claims under § 10(b) and Rule 10b-5. Therefore, dismissal of control person liability under § 20 was also proper.[8]

### C.     Securities Act Claim: § 11

The complaint also alleges a violation of § 11 of the Securities Act of 1933 based on Omnicare's alleged GAAP abuses. The district court dismissed this claim on the same grounds as the Securities and Exchange Act claims, namely a lack of loss causation. Loss causation, however, is not an element of a § 11 claim, but an affirmative defense to it. *See* 15 U.S.C. § 77*l*(b). Thus, the district court erred in dismissing this claim on that ground.

Recognizing this problem, Omnicare re-characterizes the lower court's opinion, suggesting that the district judge found the affirmative defense on the face of the complaint. Nothing in the opinion's brief footnote on § 11 supports this position.

Defendants also urge us to affirm on a different ground: that the § 11 claims fail to allege the underlying GAAP violations with the specificity required by Rule 9(b). We agree with Defendants that, since the GAAP violations sound in fraud, Rule 9(b) must

---

[8]As discussed below, Plaintiffs' claim under § 11 may survive. However, control person liability for violations of the Securities Act of 1933 is imposed under § 15 of that Act, not § 20 of the Securities and Exchange Act of 1934.

apply. *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 68 (1st Cir. 2008) (noting the specificity requirement when the claim is grounded in fraud); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (discussing the specificity requirement in cases which involve fraud); *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160-63 (3d Cir. 2004) (same); *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004) (same); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368-69 (5th Cir. 2001) (claims must sound in fraud in order to be subject to dismissal under Rule 9(b)); *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996) (Rule 9(b) requirements apply to claims brought under § 11 which are grounded in fraud); *Sears v. Likens*, 912 F.2d 889, 892-93 (7th Cir. 1990) (same). *But see In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997) (holding that "Rule 9(b) does not apply to claims under § 11of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under § 11"). Nevertheless, we decline to affirm on this alternate ground and instead leave the application of Rule 9(b) standards to the district court.

## IV.  CONCLUSION

In sum, we **AFFIRM** the district court's dismissal of the § 10(b), § 20(a), and Rule 10b-5 claims, as well as the denial of Alaska Electrical's motion to intervene. However, we **REVERSE** the dismissal of the § 11 claim and **REMAND** the case to the district court for further proceedings.