Benjamin Burt JOHNSON and Wilma Johnson, Plaintiffs,

v.

Gina LODGE, Commissioner, Tennessee Department of Human Services, Defendant.

John J. Crips and Julia M. Crips, Plaintiffs,

v.

Gina Lodge, Commissioner, Tennessee Department of Human Services, Defendant.

Case Nos. 3:09–cv–0235, 3:09–cv–0265.

United States District Court, M.D. Tennessee, Nashville Division.

Dec. 10, 2009.

**614**

Timothy Louis Takacs, Hendersonville, TN, for Plaintiffs.

Sue A. Sheldon, Tennessee Attorney General's Office, Nashville, TN, for Defendant.

### MEMORANDUM

ALETA A. TRAUGER, District Judge.

The plaintiffs and the defendant have filed cross-motions for judgment on the pleadings. Pending before the court is the motion filed by plaintiffs Benjamin and Wilma Johnson and John and Julia Crips (Docket No. 10) and the defendant's response (Docket No. 26), as well as the motion filed by defendant Commissioner Gina Lodge (Docket No. 16) and the plaintiffs' response (Docket No. 28). For the reasons discussed below, the plaintiffs' motion will be denied and the defendant's motion will be granted.

### BACKGROUND

In both of these consolidated cases, the plaintiffs were denied Medicaid benefits by the state of Tennessee.[1] The defendant, Gina Lodge, is the Commissioner of the Tennessee Department of Human Services, which administers the state's Medicaid program.

Medicaid provides medical assistance to financially needy persons. A patient in a skilled nursing facility or an intermediate care facility is eligible to receive Medicaid benefits if he or she meets certain income and resource requirements. Specifically, nursing home patients are eligible if they have assets of $2,000 or less, excluding certain types of exempt property. *See* 20 C.F.R. § 416.1205 (2009). Previously, federal law required both spouses of a married couple to spend down their assets to this level if one spouse applied for benefits. But in 1988, Congress passed the Medicare Catastrophic Coverage Act ("MCCA"), 42 U.S.C. § 1396r–5, to prevent "spousal impoverishment"—that is, to allow the non-institutionalized spouse to retain a certain level of assets and income. *See Wis. Dep't of Health & Family Servs. v. Blumer,* 534 U.S. 473, 480, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002). The states are responsible for administering the MCCA's requirements. *Id.* at 479, 122 S.Ct. 962.

When applying for Medicaid nursing home benefits, a married couple must list all of their jointly and individually owned assets.[2] *See* 42 U.S.C. § 1396r–5(c)(1)(A), (c)(2)(A). The state then calculates the community spouse resource allowance ("CSRA"), which is essentially the amount of assets that the non-institutionalized spouse (also called the "community spouse") can retain. The CSRA is one-half of the couple's non-exempt assets, provided that this amount is above the statutory floor of $20,880 and below the cap of $104,400.[3] *Id.* § 1396r–5(c)(1)(A)(ii), (f)(2).

---

1. Unless otherwise noted, factual allegations are drawn from the plaintiffs' complaints (Docket No. 1; *Crips v. Lodge,* Case No. 3:09–0265, Docket No. 1).

2. Certain property is exempt, including the couple's home and personal property. 42 U.S.C. § 1396r–5(c)(5).

3. These figures were effective during the 2008 calendar year, the time period relevant to this

The couple is required to spend down the rest of their assets, until they have only $2,000 in non-exempt assets remaining (excluding the CSRA), before the institutionalized spouse can receive Medicaid benefits.

The MCCA also allows the community spouse to receive a certain level of income, called the minimum monthly maintenance needs allowance ("MMMNA"). *See id.* § 1396r–5(d)(3)(A). In 2008, Tennessee's MMMNA was $1,750 per month. If the community spouse's income is below this level, he or she can receive part or all of the institutionalized spouse's income. *Id.* § 1396r–5(d)(1). If the couple's combined income is still below the MMMNA, the state may increase the CSRA to an amount that generates enough income to meet the MMMNA. *Id.* § 1396r–5(e)(2)(C). This CSRA adjustment occurs when the applicant and his or her spouse appeal an initial denial of benefits and participate in a "fair hearing" before a hearing officer. *Id.* § 1396r–5(e)(2).

Plaintiff Benjamin Johnson is an 83–year–old nursing home resident. His wife, Wilma Johnson, is 84. When the Johnsons applied for Tennessee Medicaid benefits, the state determined that they had combined, non-exempt assets of $164,694. (Docket No. 1, Ex. 2 at 7.) Wilma's CSRA was one-half of this, or $82,347. (*Id.*) The couple's combined monthly income was approximately $1,358, which fell short of the MMMNA by $432 per month.[4]

Because the Johnsons had not sufficiently spent down their assets, the state refused to provide Medicaid benefits. The Johnsons appealed, arguing that Wilma's CSRA should be raised to account for the MMMNA income shortfall. They argued that the new CSRA should be $172,800—effectively allowing Wilma to keep all of the couple's assets—because $172,800 is enough principal, at a 3% interest rate, to provide $432 of income per month. The hearing officer denied the Johnsons' appeal.[5]

Plaintiffs John and Julia Crips faced a substantially identical situation. Julia is an 85–year–old nursing home resident, and John is her 81–year–old husband. The couple's non-exempt assets totaled $256,415.44. One-half of that amount exceeds the $104,400 maximum, so John's CSRA was set at $104,400. The couple's income fell short of the MMMNA by $409.50. After their application for benefits was denied, they argued on appeal that the CSRA should be raised to $280,800, which at a 1.75% interest rate would provide $409.50 per month in income. The hearing officer's ruling affirmed the denial of benefits without directly discussing the monthly income issue and kept the CSRA at $104,400. (*See Crips v. Lodge*, No. 3:09–0265, Docket No. 1, Ex. 2 at 12–13.)

## ANALYSIS

The plaintiffs claim that by refusing to increase their CSRA amounts, the state

---

case. They are regularly adjusted for inflation.

4. The plaintiffs' shortfall figures account for a $40 personal needs allowance.

5. In the written ruling, the hearing officer stated that she would have increased the CSRA to the standard statutory cap of $104,400, but because "[Benjamin] has already completed a quit claim deed giving his

wife [certain] property worth $119,700 in addition to the shared resources that she has been allocated, no additional resources can be deemed protected and allocated to the community spouse." (Docket No. 1, Ex. 2 at 8.) It is unclear why the hearing officer determined that this transfer somehow shielded the $119,700 property from Medicaid's spend-down requirements. In any event, Wilma Johnson's CSRA remained at $82,347.

has ignored the statutory requirements of the MCCA and violated 42 U.S.C. § 1983. They seek an injunction ordering the state to increase their CSRAs. The plaintiffs and the defendant have filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## I. Motion for Judgment on the Pleadings Standard

The court approaches a Rule 12(c) motion for judgment on the pleadings the same way it approaches a Rule 12(b)(6) motion to dismiss. *Jelovsek v. Bredesen,* 545 F.3d 431, 435 (6th Cir.2008). Thus, the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007); *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir.2002). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Although the court must assume that all factual allegations are true, even if they are doubtful in fact, *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, legal conclusions are not entitled to an assumption of truth. *Iqbal,* 129 S.Ct. at 1950.

## II. The MCCA's Statutory Requirements

The plaintiffs' sole argument is that if a married couple's income does not meet the MMMNA, 42 U.S.C. § 1396r–5 requires the state to increase the CSRA to an amount that can generate interest income sufficient to cover the shortfall. They seek an order forcing the defendant to increase their CSRA amounts "as required by application of the formula set forth in 42 U.S.C. § 1396r–5(e)(2)(C)." (Docket No. 1 at 4.)

"In order to establish a § 1983 claim, plaintiff's complaint must allege that (1) the conduct in controversy was committed by a person acting under color of law, and (2) the conduct deprived the plaintiff of a federal right, either constitutional or statutory." *Westside Mothers v. Olszewski,* 454 F.3d 532, 543–44 (6th Cir.2006) (addressing claims that a state violated a Medicaid statute). Accordingly, the plaintiffs can only succeed if the MCCA required Tennessee to increase their CSRAs.

When interpreting statutes, the court looks first to the plain language of the statute. *U.S. v. Welles–Bowen Realty, Inc.,* 553 F.3d 979, 986 (6th Cir.2009). "If the language of the statute is clear, then the inquiry is complete, and the court should look no further." *Id.* (citation omitted). Only if the statute is "inescapably ambiguous" should a court look to persuasive authority, such as "other statutes, interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed." *Id.*

The relevant provision of the MCCA states:

Revision of community spouse resource allowance. If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2), an amount adequate to provide such a minimum monthly maintenance needs allowance.

42 U.S.C. § 1396r–5(e)(2)(C). Thus, if a couple's monthly income is less than the MMMNA, and the "amount of income gen-

erated" by the standard CSRA does not cover the shortfall, the statute requires states to "substitute[ ]" a new CSRA amount that is "adequate to provide [the MMMNA]."

The plaintiffs argue that the only permissible method for increasing the CSRA is to set it at an amount that would provide enough *interest income* to make up the MMMNA shortfall. They claim emphatically and repeatedly that this is the "statutory formula" provided in 42 U.S.C. § 1396r–5(e)(2)(C), and that any other method of adjusting the CSRA is a "phony formula." (*E.g.*, Docket No. 28 at 4–5.) This argument, however, runs afoul of the text and purpose of the statute, the relevant regulatory interpretation, and the relevant case law.

### A. Statutory Text

First, despite the plaintiffs' allegations to the contrary, the text of the statute does not set out an "arithmetical formula" for adjusting the CSRA.[6] (*See* Docket No. 1 ¶ 20.) The statute simply requires that states set the CSRA at an amount where "the income generated" by the CSRA is "adequate to provide [the MMMNA]." Certainly, one way of doing this is to set the CSRA high enough that the assets would, if placed in an interest-bearing account, produce sufficient interest income. The court will refer to this as the "inter-

est-income method." But the statute does not foreclose other methods.

The defendant argues that states may comply by setting the CSRA at an amount sufficient to purchase a single premium immediate annuity that covers the income shortfall.[7] The court will refer to this as the "annuity method" of determining CSRA increases.[8] "In effect, the annuity method requires the conversion of liquid assets into a private pension." *Ford v. Iowa Dep't of Human Svcs.*, 500 N.W.2d 26, 32 (Iowa 1993). If, for example, the income shortfall is $500 per month, and the community spouse is able to buy a $500 per month annuity for $60,000, a CSRA of $60,000 would be enough to meet the requirements of subsection (e)(2)(C).

The court finds that this annuity method is allowed under the plain language of the statute. If a person uses assets to purchase an annuity, it is entirely proper to say that the monthly annuity payments are "income generated" by those assets. *Id.* at 31–32; *see also Blumer*, 534 U.S. at 486, 122 S.Ct. 962 (counting a monthly annuity payment as part of a Medicaid applicant's income); *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 260, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (characterizing buying an annuity as "making an initial payment in exchange for a future income stream"). A CSRA that is

---

6. In fact, the plaintiffs' two complaints employ different interest rates—the Johnsons use 3% in their calculations (Docket No. 1 ¶ 21), while the Crips use 1.75%. (*Crips v. Lodge*, Case No. 3:09–0265, Docket No. 1 ¶ 21.) This undermines the claim that a statutory mathematical formula exists. Perhaps not coincidentally, both couples chose an interest rate that would allow them to keep all of their assets.

7. A single premium immediate annuity is an insurance product. The purchaser pays an initial sum of cash in exchange for regular monthly payments from the insurance compa-

ny for the rest of that person's lifetime. Typically, when the person dies, the insurance company keeps the remaining principal, if any. *See* Black's Law Dictionary (8th ed. 2004) (defining "annuity" as "[a]n obligation to pay a stated sum, usu. monthly or annually, to a stated recipient. These payments terminate upon the death of the designated beneficiary.").

8. Since the filing of the plaintiffs' complaints, the Tennessee Department of Human Services has proposed a new rule that employs the annuity method. (Docket No. 11 at 5.)

equal to or higher than the cost of a sufficient annuity is thus "[ ]adequate to raise the community spouse's income to the [MMMNA]," 42 U.S.C. § 1396r–5(e)(2)(C); there is no requirement that the state increase such a CSRA.[9]

Applied to the plaintiffs' cases, the annuity method does not require CSRA increases. Wilma Johnson's MMMNA shortfall was $432 per month, and her CSRA was $82,347. An 84–year–old woman living in Tennessee can purchase an annuity that pays $432 per month for $37,073.[10] Thus, Ms. Johnson can easily raise her monthly income to the statutory minimum by buying an annuity.[11] Similarly, John Crips' MMMNA shortfall was $409.50 per month, and his CSRA was $104,400; an 81–year–old man in Tennessee can purchase an annuity that pays

$410 per month for $37,766. Even if both plaintiffs had purchased annuities with their CSRA assets, they still would have been left with more than $20,880, which was the CSRA floor in 2008.

The plaintiffs' claim fails because they have misinterpreted the plain, unambiguous text of the statute. Nevertheless, the court will further examine the persuasive authority offered by the parties.

### B. Statutory Purpose

The annuity method is consistent with the purpose of the MCCA, which is to "protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance." *Blumer,* 534 U.S. at 480, 122 S.Ct. 962. "Congress was ... mindful that—as

---

9. The plaintiffs present evidence that Tennessee has previously used the interest-income method of calculating CSRA increases. (*See* Docket No. 28, Ex. 1.) But the state's previous practices are not at issue here. The plaintiffs' only claim is that the MCCA's language mandates the interest-income method, not that Tennessee has treated different Medicaid applicants unequally.

10. This price estimate is taken from Fidelity Investments' web site, http://personal.fidelity.com/products/annuities/, which features a "Guaranteed Income Estimator" that allows users to receive an annuity price estimate based on the purchaser's birth date and state of residence. The price is "[t]he best value available from [Fidelity's] group of pre-approved insurance companies whose products you can purchase through Fidelity." http://personal.fidelity.com /products/annuities/gie/html/how_to_interpret.html. The prices listed in this Memorandum were retrieved on December 9, 2009. Although prices fluctuate, these quotes are useful for gaining a general idea of the market rate for such annuities.

Furthermore, the court may take judicial notice of these price estimates. The court may consider judicially noticed facts on a motion to dismiss or a motion for judgment on the pleadings. *Ind. State Dist. Council of Laborers v. Omnicare, Inc.,* 583 F.3d 935, 942

(6th Cir.2009). Federal Rule of Evidence 201 provides that "'[a] court may take judicial notice, whether requested or not' of a 'judicially noticed fact' which 'must be one not subject to reasonable dispute,' a requirement satisfied if the fact is ... 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 655 n. 1 (6th Cir.2005) (explaining the court's citation to the National Association of Securities Dealers' web site and quoting Fed.R.Evid. 201); *see also Grimes v. Navigant Consulting,* 185 F.Supp.2d 906, 913 (N.D.Ill.2002) (taking judicial notice of stock prices listed on a web site). It is not subject to dispute that the Fidelity web site listed these price estimates, or that the estimates reflect prices that are accurate within a reasonable range.

Finally, even if these price estimates are somehow inaccurate, 42 U.S.C. § 1396r–5(e)(2)(C) puts the burden on applicants to "establish[ ]" at their hearing that their CSRA is inadequate. The plaintiffs did not offer evidence at their hearings that their CSRAs were too low to purchase sufficient annuities.

11. For more money—$52,346—she can buy an annuity that pays $432 per month and, upon her death, pays the remaining principal (if any) to her heirs.

part of a welfare program—Medicaid eligibility rules should not 'facilitate the transfer of accumulated wealth from nursing home patients to their nondependent children.'" *Ford,* 500 N.W.2d at 28 (quoting H.R.Rep. No. 100–105(II), at 73 (1987), *reprinted in* 1988 U.S.C.C.A.N. 857, 896). Thus, Congress sought to "minimiz[e] the transfer of accumulated wealth to nondependent children." *Id.* at 30; *see also Blumer,* 534 U.S. at 480, 122 S.Ct. 962 (noting that the MCCA sought to assure that the community spouse has a "'sufficient—but not excessive—amount of income and resources available'") (quoting H.R.Rep. No. 100–105(II), at 65, *reprinted in* 1988 U.S.C.C.A.N. at 888); *Forsyth v. Rowe,* 226 Conn. 818, 629 A.2d 379, 385 (1993) ("The medicaid program would be at fiscal risk if individuals were permitted to preserve assets for their heirs while receiving medicaid benefits from the state."). The annuity method achieves the MCCA's purpose by providing a relatively high monthly income from a relatively small capital investment. Obviously, Medicaid applicants will prefer the plaintiffs' interest-income method, because it results in a higher CSRA and ultimately allows applicants to pass more assets on to their heirs. But this preference is at odds with the welfare-program nature of Medicaid. "Congress designed a program to benefit welfare recipients, not persons seeking to benefit their heirs at the expense of other taxpayers." *Ford,* 500 N.W.2d at 31.

The plaintiffs argue that the annuity method fails to prevent spousal impoverishment because (1) the community spouse's monthly needs might eventually increase and exceed the MMMNA, and (2) the community spouse might lose the institutionalized spouse's income when the institutionalized spouse dies. (Docket No. 28 at 5.) But these problems are inherent in *any* method of increasing the CSRA to cover an income shortfall. The plaintiffs' argument highlights potential shortcomings of the concept of a fixed MMMNA and the practice of attributing the institutionalized spouse's income to the community spouse—not shortcomings of the annuity method.

Furthermore, in certain cases, the plaintiffs' interpretation of the statute would lead to absurd results. If a married couple had millions of dollars in assets but no monthly income, the plaintiffs' interest-income method would require that the community spouse be allowed to retain a huge amount of assets. Using the plaintiffs' preferred 1.75% interest rate, a community spouse with no income would be given a CSRA of $1.2 million, which is enough to generate $1,750 per month in interest income. In contrast, a community spouse receiving a $1,750 per month pension could be given a CSRA as low as $20,880. This is an illogical and inequitable result, and an elderly couple with over $1 million in assets is certainly one of the "financially secure" couples that Congress sought to exclude from the Medicaid program. *See Blumer,* 534 U.S. at 480, 122 S.Ct. 962. Using the annuity method, the CSRA of the asset-rich community spouse would be much lower—for example, a 75–year–old woman in Tennessee can purchase an annuity that pays $1,750 per month for just over $227,000. This comports better with the purpose of the MCCA.

## C. Regulatory Interpretation

In addition, the federal agency charged with interpreting Medicaid statutes has explicitly approved the annuity approach. In a July 27, 2006 letter sent to state Medicaid directors, the Centers for Medicare and Medicaid Services ("CMS"), an agency within the Department of Health and Human Services, gave guidance on spousal

impoverishment guidelines.[12] In an enclosure titled "Application of the Spousal Impoverishment 'Income–First' Rule Under the Deficit Reduction Act of 2005," CMS said:

> If ... there is [some MMMNA] "shortfall" remaining for the community spouse, determine the amount of increased resources needed to generate that amount of income for the community spouse. In making this calculation, States may use any reasonable method for determining the amount of resources necessary to generate adequate income, including *adjusting the CSRA to the amount a person would have to invest in a single premium annuity to generate the needed income*, attributing a rate of return based on a presumed available rate of interest, or other methods.

(Docket No. 16, Ex. 1 at 7 (emphasis added).)

Although the CMS letter is not entitled to *Chevron* deference, "given the unique nature of [42 U.S.C. § 1396r–5] and of [the Department of Health and Human Service's] power to interpret it, ... courts may give even relatively informal interpretations by HHS some presumption of correctness." *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 803 (6th Cir. 1998). Federal appellate courts have consistently found CMS' guidance to be informative in similar circumstances. *See S.D. v. Hood*, 391 F.3d 581, 591 n. 6 (5th Cir. 2004) ("[R]elatively informal CMS inter-

pretations of the Medicaid Act, such as the State Medicaid Manual, are entitled to respectful consideration in light of the agency's significant expertise, the technical complexity of the Medicaid program, and the exceptionally broad authority conferred upon the Secretary under the Act.") (citing *Blumer*, 534 U.S. at 497, 122 S.Ct. 962); *Cmty. Health Ctr. v. Wilson–Coker*, 311 F.3d 132, 137–38 (2d Cir.2002) (noting that "[l]ess formal [CMS] interpretations may also be entitled to mandatory deference"). Here, the deference that CMS is due supports the court's reading of the statute.

### D. Relevant Case Law

Finally, although there is little on-point case law, the courts that have interpreted subsection (e)(2)(C) agree that the statute permits the annuity method. As indicated above, the Iowa Supreme Court has found that the annuity method serves the overall purpose of the MCCA. *Ford*, 500 N.W.2d at 31–32. Similarly, the New York trial court in *Lynch v. Commissioner of the New York State Department of Health*, No. 5871–07, 18 Misc.3d 1113(A), 2008 WL 80611, at *3–4, 2008 N.Y. Misc. LEXIS 21, at *4 (N.Y.Sup.Ct. Jan. 9, 2008), held that subsection (e)(2)(C) does not "manifest[ ] an intent on the part of Congress to require that community spouses be able to meet the MMMNA from interest only, without touching the [CSRA] principal portion."[13] *See also Giaquinto v. Comm'r*

---

12. The court may consider this letter without converting the instant motions to motions for summary judgment. *Cf. J.P. Silverton Indus. L.P. v. Sohm*, 243 Fed.Appx. 82, 87 (6th Cir. 2007) (noting that courts may consider "letter decisions of governmental agencies" on motions to dismiss).

13. The *Lynch* court went on, however, to draw a distinction between the "base CSRA, which reflects a legislative judgment as to the level of 'necessary, but not excessive, ... as-

sets' that a community spouse should be permitted to retain," and the "additional resource allowance ... represent[ing] assets that are only 'necessary' for the limited purpose of providing the community spouse with the MMMNA." 2008 WL 80611 at *4, 2008 N.Y. Misc. LEXIS 21 at *5. This distinction is not supported by the text of the statute, which requires a CSRA increase *only if* the standard CSRA "is inadequate to raise the community spouse's income to the [MMMNA]." 42

*of N.Y. State Dep't of Health,* 11 N.Y.3d 179, 867 N.Y.S.2d 716, 897 N.E.2d 116, 125 (2008) (Pigott, J., dissenting) (dissenting from the majority's decision to not reach the substantive Medicaid issue and citing *Lynch* ).

In *Harris v. Department of Human Services,* 345 Ill.App.3d 764, 281 Ill.Dec. 442, 803 N.E.2d 1063 (2004), the court addressed an Illinois regulation that adopted the annuity method. The *Harris* plaintiff argued that the regulation was improper, because "both the [CSRA] asset allowance and the [MMMNA] income are minimum entitlements such that neither should be sacrificed so that the other minimum amount can be achieved. Thus, it is the institutionalized spouse's assets, not those of the community spouse, that are to be used to purchase the annuity." *Id.,* 281 Ill.Dec. 442, 803 N.E.2d at 1066 (citation omitted). The Illinois appellate court disagreed, holding that, under the plain language of subsection (e)(2)(C), "only if the [CSRA] is insufficient to raise the community spouse's income to the minimum level will another amount beyond the established [CSRA] be substituted." *Id.* "Only a tortured reading of section 1396r–5(e)(2)(C) of the MCCA could lead to [the plaintiff's] interpretation of that section." *Id.,* 281 Ill.Dec. 442, 803 N.E.2d at 1067.

This court agrees with the *Harris* and *Ford* courts. These cases confirm the court's determination that the MCCA does not require Tennessee to increase the plaintiffs' CSRAs.

### CONCLUSION

If a community spouse's income does not meet the MMMNA, that person can purchase a single premium immediate annuity to make up the shortfall. Under the plain

U.S.C. § 1396r–5(e)(2)(C). The statute clearly contemplates that sometimes, the standard CSRA will be adequate to raise the communi-

terms of 42 U.S.C. § 1396r–5(e)(2)(C), a state is not required to increase a CSRA if the CSRA already exceeds the cost of such an annuity. Accordingly, the defendant's motion will be granted, and the plaintiffs' motion will be denied. The two consolidated cases will be dismissed.

An appropriate order will enter.

### ORDER

For the reasons expressed in the accompanying Memorandum, the Motion for Judgment on the Pleadings filed by plaintiffs Benjamin Burt Johnson, Wilma Johnson, John J. Crips, and Julia M. Crips (Docket No. 10) is **DENIED.** The Motion for Judgment on the Pleadings filed by defendant Commissioner Gina Lodge (Docket No. 16) is **GRANTED,** and these consolidated cases (Nos. 3:09–cv–0235 and 3:09–cv–0265) are hereby **DISMISSED.** Entry of this Order shall constitute the judgment in these cases.

ty spouse's income to the MMMNA level. The court thus declines to follow *Lynch* on this point.